| Objection Deadline: | June 16, 2014 |
| Reply Deadline: | June 20, 2014 |
| Hearing Date: | June 26, 2014 at 9:45 am. (ET) |

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Veerle Roovers
Stephen Pearson
Amy Edgy Ferber

*Attorneys for Chapter 11 Trustee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
:
In re: :    Chapter 11
:
SOUNDVIEW ELITE LTD., *et al.,* :    Case No. 13-13098 (REG)
:
Debtors. :    (Jointly Administered)
:
-------------------------------------------------------- x
CORINNE BALL, as Chapter 11 Trustee of :
SOUNDVIEW ELITE LTD., :
:    Adv. Proc. No. 14-01923 (REG)
Plaintiff, :
v. :
:
SOUNDVIEW COMPOSITE LTD., :
:
Defendant. :
:
---------------------------------------------------------------x

**REPLY MEMORANDUM OF LAW IN SUPPORT OF THE**
**TRUSTEE'S MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ...................................................................... 1

ARGUMENT .................................................................................................. 3

    A.    SUMMARY JUDGMENT IS WARRANTED BECAUSE THERE IS NO
          GENUINE DISPUTE AS TO THE MATERIAL FACTS IN ISSUE ................. 4

          1.    Soundview Elite made a multi-million dollar investment in
                 Soundview Composite, resulting in Soundview Elite ultimately
                 acquiring a 100% economic interest in that fund ...................................... 4

          2.    Both Soundview Elite and Soundview Composite were at all
                 relevant times controlled and managed by entities controlled by
                 Fletcher and individuals who ultimately reported to him ......................... 4

          3.    In 2010, Soundview Elite issued a redemption request which
                 Soundview Composite honored, thereby reducing Soundview
                 Elite's holdings in Soundview Composite ................................................. 4

          4.    Soundview Composite had not gated or suspended redemptions
                 during the period when Soundview Elite sought to exercise its
                 redemption rights .................................................................................... 5

          5.    Soundview Composite has not honored the 2011 Redemption
                 Request and has paid nothing to Soundview Elite in that regard ........... 10

          6.    The amount Soundview Composite owes to Soundview Elite in
                 connection with the 2011 Redemption Request is at least $3.87
                 million ................................................................................................... 12

    B.    DEFENDANT'S ARGUMENTS TO THE CONTRARY ARE BARRED
          BY THE DOCTRINES OF JUDICIAL ESTOPPEL ......................................... 13

CONCLUSION .............................................................................................. 20

# TABLE OF AUTHORITIES

Page

<span style="font-variant: small-caps">Cases</span>

*Adelphia Recovery Trust v. Goldman Sachs & Co.*,
No. 11-1858-cv, 2014 U.S. App. LEXIS 6211 (2d Cir. Apr. 4, 2014)..............................13, 14

*Amusement Indus. v. Stern*,
693 F. Supp. 2d 327 (S.D.N.Y. 2010)...................................................................................18

*B&M Linen Corp. v. 222 Laundry LLC*,
Adv. Proc. No. 12-1885-alg, 2013 Bankr. LEXIS 2832 (Bankr. S.D.N.Y. July 12, 2013).....14

*B.T. Produce Co. v. Robert A. Johnson Sales, Inc.*,
354 F. Supp. 2d 284 (S.D.N.Y.2004)...................................................................................13

*DeFabio v. East Hampton Union Free School Dist.*,
623 F.3d 71 (2d Cir. 2010)...................................................................................................4

*Defer LP v. Raymond James Fin., Inc.*,
654 F. Supp. 2d 204 (S.D.N.Y. 2009)..................................................................................18

*Glidepath Holding B.V. v. Spherion Corp.*,
590 F.Supp. 2d 435 (S.D.N.Y. 2007)...................................................................................18

*In re Adelphia Comms. Corp.*,
2007 WL 601452 (Bankr. S.D.N.Y. Feb. 20, 2007).............................................................18

*Jasper v. Sony Music Entm't, Inc.*,
378 F. Supp. 2d. 334 (S.D.N.Y. 2005).................................................................................12

*Jeffreys v. City of New York*,
426 F.2d 549 (2d Cir. 2005)....................................................................................3, 6, 9, 12

*Kings Terrace Nursing Home & Health Related Facility v. New York State Dep't of
Social Servs.*, 1995 Bankr. LEXIS 157 (Bankr. S.D.N.Y. Jan. 26, 1995) ...............................13

*Lebewohl v. Heart Attack Grill LLC*,
890 F. Supp. 2d 278 (S.D.N.Y. 2012)....................................................................................8

*Lia v. Saporito*,
909 F. Supp. 2d 149 (E.D.N.Y. 2012) ..................................................................................19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)...............................................................................................6, 10, 12

*Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*,
692 F.3d 983 (9th Cir. 2012) ...............................................................................................19

*Mitchell v. Washingtonville Cent. School Dist.*,
190 F.3d 1 (2d Cir. 1999) ...................................................................................................14

*Nat'l Org. for Women Inc. v. Scheidler*,
510 U.S. 249 (1994).............................................................................................................9

-ii-

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)................................................................................13

*Raskin v. Wyatt Co.*,
    125 F.3d 55 (2d Cir. 1997).......................................................................8

*Riel v. Morgan Stanley*,
    2007 U.S. Dist. LEXIS 11153 (S.D.N.Y. Feb. 16, 2007)........................13

*Rissetto v. Plumbers and Steamfitters Local 343*,
    94 F.3d 597 (9th Cir. 1996) ....................................................................14

*Shaw Family Archives Ltd. v. CMG Worldwide, Inc.*,
    05 Civ. 3939 (CM), 2008 U.S. Dist. LEXIS 67529 (S.D.N.Y. Sept. 2, 2008) ........................19

*Sperling v. U.S.*,
    692 F.2d 223 (2d Cir. 1982), *superseded on other grounds*, 124 F.3d 361 (2d Cir. 1997) ....................................................................13

*Swift Spindrift, Ltd. v. Alvada Ins., Inc.*,
    2013 WL 3815970 (S.D.N.Y. July 24, 2013) ........................................18

*Taylor v. Sturgell*,
    553 U.S. 880 (2008)................................................................................19

*Therion, Inc. v. Media by Design, Inc.*,
    No. CV 08-5256 (TCP)(ETB), 2010 WL 5341925 (E.D.N.Y. Nov. 10, 2010).........................3

*Tradax Energy, Inc. v. Cedar Petrochecmicals, Inc.*,
    317 F. Supp. 2d 373 (S.D.N.Y. 2004).....................................................8

*U.S. v. Bagaric*,
    706 F.2d 42 (2d Cir. 1983)......................................................................8

*Weizmann Inst. of Sci v. Neschis*,
    229 F. Supp. 2d 234 (S.D.N.Y. 2002).....................................................13

## OTHER AUTHORITIES

Fed. R. Civ. P. 56 ........................................................................................1

Fed. R. Civ. P. 56(c)(4)...............................................................................8

Fed. R. Civ. P. 56(e)(2)...............................................................................3

Fed. R. Evid. 801(d)(2)(D) .........................................................................9

Fed. R. Evid. 901(a)....................................................................................8

Fed. R. Evid. 901(b)(4)...............................................................................8

Federal Rule of Bankruptcy Procedure 7056................................................1

Corinne Ball, not individually but solely in her capacity as chapter 11 trustee (the
"**Trustee**" or "**Plaintiff**") of, among others, Soundview Elite Ltd. ("**Debtor**" or "**Soundview
Elite**") and Plaintiff in the above-captioned adversary proceeding (the "**Adversary Proceeding**"),
by and through her attorneys, Jones Day, submits this reply memorandum of law in further
support of her motion for summary judgment pursuant to Federal Rule of Civil Procedure 56,
made applicable to the Adversary Proceeding by Federal Rule of Bankruptcy Procedure 7056.

## PRELIMINARY STATEMENT

Defendant's opposition to the Trustee's summary judgment motion is a tap dance
designed to distract the Court from the fact that Soundview Composite owes Soundview Elite
millions of dollars, which it refuses to pay.  Tellingly, Soundview Composite does not dispute
that Soundview Elite invested millions of dollars in Soundview Composite, thereby becoming
the holder of 100% of the economic interests in that fund.  There is no dispute that this
investment has dwindled to a fraction of its original value under the "management" of Fletcher,
entities that he controls, and individuals who ultimately report to him.  And Soundview
Composite does not dispute that it has paid nothing to Soundview Elite in connection with what
remains of its investment.  Rather than pay Soundview Elite what it is owed (or what remains of
what it is owed), Soundview Composite continues playing its shell game with Soundview Elite's
money, all in the apparent hope of garnering more management and director fees.

Soundview Composite bends over backwards to obscure key material facts, including that
(i) at all relevant times, Fletcher ultimately controlled <u>all</u> the key players on both sides of the
2011 Redemption Request, including Soundview Composite, Soundview Elite, Soundview
Capital Management (the investment manager of both these funds), Richcourt Holdings (a parent
of the funds), Richcourt USA (a manager of both funds), as well as their employees, officers and
directors, all of whom ultimately reported to Fletcher – this was not a transaction between

disinterested and unrelated parties; (ii) Soundview Composite has admitted, in its business records, its advisors' internal communications, representations to this Court and letters to its regulators, that it owes at least $3.87 million to Soundview Elite on its outstanding redemption request -- despite controlling all the relevant entities and records, Defendant offers no business documents to the contrary; and (iii) Soundview Composite has failed to "satisfy" that redemption request as it promised its Cayman Islands regulators – a fact Defendant concedes.

Instead, Soundview Composite posits disingenuous arguments to delay the adjudication of the merits of this case.  First, it quibbles with the authenticity of business records that Fletcher-controlled entities created and maintained and ultimately produced to the Trustee in this case.  As explained below, Soundview Composite misstates the law on this issue and cannot demonstrate any genuine dispute as to the authenticity of these documents.  (*See* pp. 7-9 below)

Second, confirming that Fletcher will do and say anything to drag this litigation out as long as possible, Soundview Composite strains to distance itself from the statements and assurances of its own counsel and employees.  After relying on statements by its counsel Warren Martin to avoid the imposition of a TRO – and the collateral consequences such an order might have on all Fletcher-controlled entities, including Soundview Composite – Fletcher now asserts that he was "shocked" to learn of the representations Martin made after admittedly meeting with Fletcher before the hearing to discuss legal strategy.  (*See* Fletcher Aff. ¶ 37)  But he does not dispute the most important admission made by his agent Martin, the existence of a $3.87 million debt owed by Soundview Composite to Soundview Elite.  (*See* pp. 14-15 below)

Likewise, after successfully placating Cayman Island regulators with a letter containing assurances that pending redemptions would be "satisf[ied]," Fletcher now contends that his counsel who wrote that letter was "wrong" when he told those regulators that redemptions at

Soundview Composite "had never been gated or suspended." (*See* Fletcher Aff. ¶ 31) His

attempt to dance around his agent's representation is unfounded for a number of reasons. (*See*

pp. 5-6 below) And now Fletcher even seeks to disavow admissions made by other Soundview

Composite agents, including Deborah Midanek (one of its directors) and Ann Loeb (an employee

of Richcourt USA, an agent of Soundview Composite that is also ultimately controlled by

Fletcher). (*See* pp. 7-12 below) The tap dance continues.

Third, Soundview Composite presents a misleading view of proceedings before this

Court, its correspondence with Cayman Islands regulators, and the 2011 Redemption Request to

proffer "gotcha" legal arguments in response to the Trustee's straightforward showing that

Soundview Composite owes Soundview Elite at least $3.87 million. These arguments are

refuted below, as most are based on flawed legal reasoning or faulty factual predicates.

In the end, Soundview Composite has failed to meet its burden of showing that there are

genuine disputes as to material facts such that this case cannot be decided on this motion.

## ARGUMENT

It is well settled that a party seeking to avoid summary judgment "may not rest upon

mere allegations or denials in his pleadings, but … must set forth specific facts showing there is

a genuine issue for trial." *Therion, Inc. v. Media by Design, Inc.*, No. CV 08-5256 (TCP)(ETB),

2010 WL 5341925, at *5 (E.D.N.Y. Nov. 10, 2010) (quoting *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986)); Fed. R. Civ. P. 56(e)(2). Such party "'must do more than simply

show that there is some metaphysical doubt as to the material facts,' … and [it] 'may not rely on

conclusory allegations and unsubstantiated speculation.'" *Jeffreys v. City of New York*, 426 F.2d

549, 554 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986)). The "mere possibility that a factual dispute may exist, without more, is not

sufficient to overcome a convincing presentation by the moving party." *DeFabio v. East Hampton Union Free School Dist.*, 623 F.3d 71, 81 (2d Cir. 2010) (citation omitted).

## A.    SUMMARY JUDGMENT IS WARRANTED BECAUSE THERE IS NO GENUINE DISPUTE AS TO THE MATERIAL FACTS IN ISSUE

In the Trustee's moving papers, she demonstrated all the material facts, about which there is no genuine dispute, leading to the conclusion that Soundview Composite owes Soundview Elite at least $3.87 million.  (Trustee Mem. at 10-18)  In particular, the Trustee showed that:

1.    **Soundview Elite made a multi-million dollar investment in Soundview Composite, resulting in Soundview Elite ultimately acquiring a 100% economic interest in that fund.**  (*See* Trustee Mem. at 2-6, 12-13)

Soundview Composite does not dispute this.  (*See, e.g.,* Answer ¶ 26)

2.    **Both Soundview Elite and Soundview Composite were at all relevant times controlled and managed by entities controlled by Fletcher and individuals who ultimately reported to him.**  (*See* Trustee Mem. at 2-3, 5-6, 12-13)

While Soundview Composite tries to obscure the controlling role played by Fletcher, in the end, it cannot hide the fact that at all times relevant to this litigation Soundview Capital Management, which was and is ultimately majority-owned and controlled by Fletcher, was the investment manager for both Soundview Elite (the redeemer) and Soundview Composite (the obligor on that redemption).  (*See* Fletcher Aff. ¶¶ 4-8)  Fletcher also concedes that he acquired the majority share of Richcourt Holdings, which ultimately controlled Richcourt USA, an agent of both Soundview Composite and Soundview Elite.  (*Id.*)  Fletcher also owns the controlling interest in Fletcher Asset Management, RPGP Limited, and other entities involved in the day-to-day operations and control of both Soundview Elite and Soundview Composite.  (*Id.*)  In short, there is no genuine dispute about Fletcher's control over both sides of this redemption.

3.    **In 2010, Soundview Elite issued a redemption request which Soundview Composite honored, thereby reducing Soundview Elite's holdings in Soundview Composite.**  (*See* Trustee Mem. at 6, 14)

Soundview Composite does not dispute this even though it helps refute Fletcher's newly minted theory that redemptions have always been gated.  (Answer ¶ 32)

4.     **Soundview Composite had not gated or suspended redemptions during the period when Soundview Elite sought to exercise its redemption rights.**  (*See* Trustee Mem. at 6-8, 14-17)

Despite Soundview Composite's admissions on this score, Fletcher raises specious arguments to try to dispute this fact.  Notably, he cannot challenge the admissibility of the letters dated May 11, 2012 and June 10, 2013 (dated June 10, but sent on July 10) that Soundview Composite sent to the Cayman Islands Monetary Authority ("**CIMA**") (Dailey Decl. Exs. G and J), which admit the lack of gating or suspensions at Soundview Composite.  Soundview Composite authenticated these letters and admits they were sent.  (*See* Answer ¶¶ 36, 37)

Instead, Fletcher conveniently asserts that Soundview Composite's lawyer who sent the first letter was wrong (Fletcher Aff. ¶ 31) in writing that Soundview Composite's redemptions have "not been gated or suspended."  (Dailey Decl. Ex. G at 3)  Fletcher concocts a strained reading of the Private Placement Memorandum ("**PPM**") whereby he now contends for the first time that all redemptions were gated at all times, unless there is an express written waiver by the board which Fletcher conveniently cannot now find.  (Fletcher Aff. ¶¶ 30, 31)  He nowhere explains, however, why despite his helping to write the follow-on July 10 letter to CIMA (*id.* ¶ 21), Fletcher never corrected the supposedly incorrect earlier statement of his counsel.  Nor does he explain why Soundview Composite did not ever write to the regulators to explain that all redemptions had always been gated.  He was content, apparently, to get the regulators off his back with his counsel's assurance that redemptions were not gated and would be "satisfied," purportedly knowing (as he now contends) that all redemptions had been gated from the start. This reflects either bad faith in Soundview Composite's report to its regulators (in which case,

Defendant's unclean hands should not be rewarded) or, more likely, this is just a newly minted reading that Fletcher hopes will further postpone Soundview Elite collecting its money.

The fact is that, other than Fletcher's self-serving affidavit, Soundview Composite presents no evidence showing that there is a genuine dispute as to the lack of gating at Soundview Composite. It has produced no documents (despite having all the relevant files) or testimony (especially from those actually managing this fund) showing that the parties treated all redemptions as gated at all times or that this newly minted reading of the PPM was implemented in any way. For example, despite admitting that Soundview Composite redeemed shares for some undisclosed "original" investor (Fletcher Aff. ¶ 6) and for Soundview Elite in 2010 (Answer ¶ 32), Soundview Composite proffers no copies of any waiver executed by board members to allow these redemptions to proceed. Indeed, this new theory is the very type of conclusory and unsupported conjecture that courts have held are insufficient to defeat a motion for summary judgment. *See Jeffreys*, 426 F.2d at 554; *Matsushita Elec. Indus.*, 475 U.S. at 587.

Moreover, Fletcher's newly minted reading of the PPM presents multiple inconsistencies, which he cannot explain away. For example, the PPM is littered with language confirming that redemptions were not gated at all times. The Risk Factors section of the document nowhere mentions this purported onerous limitation, but instead states that "[s]hareholders generally may redeem all or some of their Shares of any Class after the applicable one-year lock-up period …" (Dailey Decl. Ex. D at 36-38; *see id.* at 38 ("In accordance with the Fund's Articles of Association, the Directors *may* limit, defer or suspend redemptions under certain circumstances."); *see also* Fletcher Aff. Ex. 1 at 20-25 (excerpt from Articles of Association showing that redemptions are generally allowed but *may* on occasion be limited)) The PPM identifies risks associated with the possibility that under certain circumstances redemptions

"may" be limited.  (*See id.* at 36, 38)  The Risk Factors section nowhere says that redemptions

are gated from the start and a written waiver by the directors must be obtained for a shareholder

to redeem.  And Fletcher's new theory is inconsistent with the provision governing redemption

payments (Trustee Mem. at 4; Dailey Decl. Ex. D at 37), which requires payment of 90% of the

value of the shares being redeemed within 40 days of the next applicable Redemption Date.  (*Id.*)

Fletcher even misreads the Limitation of Redemptions paragraph on which he relies.

That paragraph aims at preventing the proverbial run on the bank, in which shareholders

collectively seek all at once to redeem shares far in excess of the fund's Net Asset Value

("**NAV**").  (*Id.* at 38)  If that happens, each redeemer's request will be decreased on a pro rata

basis – which makes no sense where, as here, there is only one shareholder (Soundview Elite) in

the entire fund.  And then redemptions will be spaced out over a series of quarterly Redemption

Dates.  (*Id.*)  The associated section of the Articles of Association confirms this reading:

> If one or more Redemption Requests are received in respect of any
> one Redemption Day that would, if satisfied, result in the
> redemptions of an amount equal to more than 10% of the total net
> asset value of the Company or any Master Fund, the Directors *may*
> determine in their absolute discretion to reduce the amount of each
> Redemption Request pro rata so that ....

(Fletcher Aff. Ex. 1 ¶ 29(j) (emphasis added))  And Fletcher nowhere explains why, if it were

relying on these paragraphs, Soundview Composite did not do that with Soundview Elite's 2010

or 2011 Redemption Requests – *i.e.*, space out payments over time.  It did not do so, because

there is no evidence that this paragraph was ever applied as Fletcher now contends and, as Ann

Loeb explained, it makes no sense to apply it when the sole shareholder redeems all of its

holdings because there are no other shareholders who might be prejudiced thereby.

Relatedly, Soundview Composite complains about the authenticity of the emails that

preceded its letters to its Cayman regulators (*see* Trustee Mem. at 7-8; Dailey Decl. Ex. F) and,

in particular, to the statements therein by Ann Loeb, an employee of Richcourt USA (an agent of Soundview Composite, Soundview Elite, and Soundview Capital Management). (*See* Def. Mem. at 14-18) Soundview Composite, however, misstates the law on this issue. It is simply not true that "[e]very document used to support a motion for summary judgment must be authenticated through an affidavit or declaration made upon personal knowledge." (Def. Mem. at 15)[1] In fact, no such authentication from a business-records custodian is required. *See Lebewohl v. Heart Attack Grill LLC*, 890 F. Supp. 2d 278, 297-99 (S.D.N.Y. 2012); *Raskin v. Wyatt Co.*, 125 F.3d 55, 65 (2d Cir. 1997) (admitting documents cited in summary judgment motion despite movant failing to submit a custodial affidavit).[2] It is true that the Federal Rules of Evidence apply on a summary judgment motion. *Id.* But "[t]he bar for authentication is not particularly high." *Lebewohl*, 890 F. Supp. 2d at 298 (citing *U.S. v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007)).

"The test for authentication under Federal Rule of Evidence 901 is, simply, whether a reasonable juror could find proffered evidence authentic." *Lebewohl*, 890 F. Supp. 2d at 298; *see also* Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is"). Rule of Evidence 901 notes, for example, that "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances" satisfies the authentication requirement. Fed. R. Evid. 901(b)(4); *see U.S. v. Bagaric*, 706 F.2d 42, 67 (2d Cir. 1983) (Rule of Evidence 901 may be

---

[1] Defendant misreads Fed. R. Civ. Proc. 56(c)(4). The rule does not require every single supporting document to be accompanied by an affidavit. Instead, the Rule states that if an individual submits an affidavit in support of the summary judgment motion, he or she must have personal knowledge of the facts therein.

[2] Defendant cites *Tradax Energy, Inc. v. Cedar Petrochecmicals, Inc.*, 317 F. Supp. 2d 373 (S.D.N.Y. 2004), where the court dealt with an affidavit that simply attached documents to it. In this case, by contrast, Fletcher and his cohorts admitted that the records of the Soundview funds, including Soundview Composite and Soundview Elite, were kept at 48 Wall Street and with the Porzio law firm. (*See* Dailey Decl., ¶¶ 2-11) They are bound by that admission, which the Dailey Declaration recounts along with the process whereby these records were collected.

satisfied "based entirely on circumstantial evidence"), abrog*ated in part on other grounds by*
*Nat'l Org. for Women Inc. v. Scheidler*, 510 U.S. 249 (1994).

The Declaration of Michael Dailey submitted by the Trustee describes the provenance of
these documents and provides ample confirmation of their authenticity and admissibility.[3]  And
Soundview Composite has pointed to no specific facts demonstrating a genuine dispute as to the
authenticity of these emails or any other documents.  It has presented nothing to show they are
incomplete, inaccurate, altered or falsified.  Nor has it offered any explanation as to how entities
Fletcher controlled produced supposedly non-authentic documents to the Trustee.

As for Ann Loeb's statement that it would make no sense for Soundview Composite to
gate redemptions when it had only one shareholder (*see* Trustee Mem. at 7-8; Dailey Decl. Ex. F
at 3), Soundview Composite offers no evidence suggesting that she might have been acting
outside the scope of her employment or agency.  In reality, Ms. Loeb was making these
statements to *all* of the Soundview funds' outside counsel *and* to their director Stuart Turner and
secretary Floyd Saunders.  (*Id.*)  Thus, her statements as to Soundview Composite constitute
admissions as an agent for that fund.  (*See* Fed. R. Evid. 801(d)(2)(D))  Soundview Composite's
speculation that emails can, in general, be created outside the scope of one's employment (Def.
Mem. at 15) is, of course, insufficient to defeat summary judgment.  *See Jeffreys*, 426 F.2d at

---

[3]  In collecting the Soundview Debtors' books and records, the Trustee and her counsel contacted, among
others, Fletcher.  (Dailey Decl. ¶ 3, Ex. P)  Fletcher informed the Trustee that "Floyd Saunders, corporate secretary,
and Stuart MacGregor, manager of RF Services, maintain the Soundview records along with outside counsel (Porzio)
and the administrator (Pinnacle)."  (*Id.* Ex. Q)  During February and March of 2014, Dailey obtained the business
records that Fletcher noted were in Porzio's possession.  (*Id.* ¶ 5)  Dailey also communicated with Stewart Turner
who indicated that all the Debtors' business records were maintained on computer systems that Fletcher Asset
Management owned, located at 48 Wall Street, New York.  (*Id.* ¶¶ 6-7  Dailey met there with Saunders and Fletcher
Asset Management's IT director, David Lepelstat, who provided him access to Composite's business records.  (*Id.* ¶¶
8-9)  Dailey also had a telephonic conference with MacGregor and Saunders to confirm that business records were
only stored at the locations to which he was provided access.  (*Id.* ¶ 10)  Notably, Soundview Composite has offered
no affidavits from Fletcher, Saunders, MacGregor, Turner or Porzio to contradict the Dailey Declaration or to
dispute that the documents cited in this motion are, in fact, business records of these Soundview entities.  (*See*
Fletcher Aff. ¶ 10 (admitting that the Trustee has Soundview Elite's books and records))

554; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.  In the end, Soundview Composite would like

this document disregarded simply because it highlights the fundamental flaw in Fletcher's newly

minted reading of the gating limitation under the PPM.  If, in fact, gating had always been in

place, the employees charged with managing the funds would have known that, and this email

exchange would never have taken place.  At the very least, one would have expected Turner or

Saunders, both active participants in this email exchange, to have corrected Ms. Loeb.

> 5.      **Soundview Composite has not honored the 2011 Redemption Request and
> has paid nothing to Soundview Elite in that regard.**  (*See* Trustee Mem. at 6-9, 17)

Soundview Composite does not dispute this.  (*See* Answer ¶ 41 (admitting it has paid

nothing to Soundview Elite in connection with the redemption request in issue))  Instead,

Soundview Composite raises specious defenses challenging the mechanics of Soundview Elite's

2011 Redemption Request.  First, Soundview Composite contends that no redemption request

was ever sent because Fletcher can locate no copy of the written redemption request.  (Fletcher

Aff. ¶¶ 10, 11, 15)  Trying to make a virtue out of the poor record keeping of entities he controls

(or the incompleteness of their document production to the Trustee), Fletcher ignores business

records that confirm the existence of this outstanding redemption request.  (*See* Dailey Decl. Exs.

F at 12-13; G at 2; H at 4; J at 14-15; K at 3)  Fletcher himself even offers a new document

confirming the existence of this outstanding redemption request.  (*See* Fletcher Aff. Ex. 6 at 3, 5

(noting "Full Position Redemption, Approx $5.66mm" for Soundview Composite))

Second, Fletcher asserts that the request did not comply with the housekeeping

requirements of the PPM and Articles of Association.  (Fletcher Aff. ¶¶ 12-14)  More accurately,

Soundview Composite contends that the Trustee has not proven that all mechanical niceties were

observed.  On a preliminary note, this is irrelevant in light of the admissions and documents

evidencing the existence of this outstanding redemption request.  Moreover, this is disingenuous

since Fletcher-controlled entities operated on both sides of this redemption request.  If it were in some way improperly documented or approved, then Fletcher-controlled entities were at fault. And since it is reflected on Soundview Composite's business records as outstanding and owed (and presented to CIMA and this Court as such), alleged technical flaws in the documentation (which Fletcher entities control in any event) are no basis for denying its validity.[4]

Third, Fletcher contends that several documents comprising the business records of Soundview Composite are either not authentic or somehow mistaken in reflecting an outstanding redemption from Soundview Composite's sole shareholder, Soundview Elite.  (Fletcher Aff. ¶¶ 15-19)  This contention fails for the reasons explained above, and Soundview Composite has not set forth specific facts giving rise to a genuine dispute as to the authenticity of these records.

Next, Fletcher argues that his employees (involved in simultaneously managing Soundview Elite and Soundview Composite) had no authority to request a redemption.  (Fletcher Aff. ¶¶ 8, 16-18)  This is a red herring.  The Trustee has never contended as much.  But the fact that Fletcher spends so much time trying to shoot down this strawman shows his desperation to distance himself from the actions of any of his agents or representatives which might confirm the Trustee's factual showing here.  He argues that Richcourt USA employee Dean Rubino had no authority to issue a redemption request (Fletcher Aff. ¶¶ 16-18), but the document he cites and Fletcher's recitation of the facts confirm that in June 2011 (as the Trustee has shown) Fletcher and his director cronies were discussing a redemption request for Soundview Elite.  (*Id.*)

---

[4]    The doctrine of equitable estoppel allows the Court to ensure fair dealing, good conscience, and to prevent injustice.  (*See* Trustee's Mem. at 25-26)  Even applying the elements cited by Soundview Composite (Def. Mem. at 34) demonstrates its applicability in this regard.  Since Fletcher-controlled entities operated on both sides of the 2011 Redemption Request (and both entities were controlled by the same investment manager (also controlled by Fletcher and his cronies)), Soundview Composite should not be heard to now complain about alleged defects in the documentation of Soundview Elite's efforts to secure the return of its money.  The cases cited by Soundview Composite (Def. Mem. at 34-36) are inapposite because none of them addresses circumstances like these where a party on both sides of a transaction tries to avoid its own obligations by pointing to its own documentation failings.

Soundview Composite also argues that two letters that Deborah Midanek sent to the

Cayman regulators (and attachment thereto) are not Soundview Composite business records.

(Def. Mem. at 19)  More correctly, Soundview Composite has failed to make its required

showing that there is a genuine dispute as to the authenticity of these records.  *See Jeffreys*, 426

F.2d at 554; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.  And Soundview Composite ignores

the fact that these letters constitute admissions by Soundview Composite and are therefore not

hearsay.  While Midanek may have been removed as director prior to her sending the June 13,

2013 letter (Fletcher makes no showing to prove that), she was admittedly still a director when

she sent the May 28, 2013 letter.  And Soundview Composite has made no showing that she was

operating outside of the scope of her employment in sending either letter.

6.    **The amount Soundview Composite owes to Soundview Elite in connection with the 2011 Redemption Request is at least $3.87 million.**  (*See* Trustee Mem. at 8-9, 17-18)

Again, Soundview Composite offers no evidence as to the NAV or value of the fund at

the time of the 2011 Redemption Request or at any time.  Instead, Soundview Composite asserts

that the Trustee has not proven its value at the time of redemption.  (*See* Fletcher Aff. ¶ 26)

Defendant replays its specious authentication arguments to ignore documents reflecting the value

of the Soundview Elite's redemption receivable at various times – always equal to or greater than

$3.87 million.  (Def. Mem. at 16-18)  Those contentions fail for the reasons noted above.

In addition, Soundview Composite relies on flawed arguments as to judicial estoppel to

try to walk away from the representations made by Warren Martin, counsel for Fletcher and the

entities he controls, as to the debt owed by Soundview Composite to Soundview Elite being

valued as at least $3.87 million.  (*See* pp. 13-20 below) [5]

---

[5]  A court may take judicial notice under Federal Rule of Evidence 201 of "public records, including pleadings, testimony, and decisions in prior [court actions]."  *Jasper v. Sony Music Entm't, Inc.*, 378 F. Supp. 2d.

Finally, the Katz Affidavit (Dailey Decl. Ex. E) also constitutes an admission by the

entities Fletcher controls, including Soundview Capital Management (Soundview Composite's

agent) and Soundview Elite.  And it is a document of which the Court can take judicial notice,

especially since it is being used here merely to confirm the admissions made by Warren Martin

that the debt owed to Soundview Elite is at least $3.87 million.  Notably, Soundview Composite

offers nothing to show that the debt is less than that amount.

## B.    DEFENDANT'S ARGUMENTS TO THE CONTRARY ARE BARRED BY THE DOCTRINES OF JUDICIAL ESTOPPEL

As explained in the Trustee's moving brief (*see* Trustee's Mem. at 18-20), the doctrine of

judicial estoppel is equitable in nature and designed "to protect the integrity of the judicial

process."  *Kings Terrace Nursing Home & Health Related Facility v. New York State Dep't of

Social Servs.*, 1995 Bankr. LEXIS 157, at *18 (Bankr. S.D.N.Y. Jan. 26, 1995) (citation omitted).

The doctrine does so by "prohibiting parties from deliberately changing positions according to

the exigencies of the moment."  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).  Litigants

"should not be permitted to play 'fast and loose with the courts' by taking inconsistent positions

in related proceedings."  *Sperling v. U.S.*, 692 F.2d 223, 227 (2d Cir. 1982) (Van Graafeiland, J,

concurring), *superseded on other grounds*, 124 F.3d 361 (2d Cir. 1997).

Applying the doctrine is left to the discretion of the court, and the Second Circuit has

recognized that its scope is "probably not reducible to any general formulation of principle."

*Adelphia Recovery Trust v. Goldman Sachs & Co.*, No. 11-1858-cv, 2014 U.S. App. LEXIS

6211, at *10-23 (2d Cir. Apr. 4, 2014).  In exercising their discretion, courts consider (i) whether

---

(continued…)

334, 338 (S.D.N.Y. 2005); *B.T. Produce Co. v. Robert A. Johnson Sales, Inc.*, 354 F. Supp. 2d 284, 285 n.2
(S.D.N.Y.2004); *Riel v. Morgan Stanley*, 2007 U.S. Dist. LEXIS 11153, at *28 n.2 (S.D.N.Y. Feb. 16, 2007);
*Weizmann Inst. of Sci v. Neschis*, 229 F. Supp. 2d 234, 246-49 (S.D.N.Y. 2002).

the party's later position is "clearly inconsistent" with its earlier position, (ii) whether the party

convinced the court to accept its earlier position, and (iii) whether the party seeking to assert an

inconsistent position would derive an unfair advantage if not estopped.  *Id.*  The Court must

consider the totality of the circumstances to determine how best to protect its own process.

For example, in evaluating whether the party was successful in the prior proceeding,

there is no requirement that the court make findings of fact or adopt the party's statement in an

opinion.  Rather, the court need only have adopted the position "in some manner," including as

part of a favorable settlement.  *See Mitchell v. Washingtonville Cent. School Dist.*, 190 F.3d 1, 6

(2d Cir. 1999) (prior position must have been adopted "in some manner"); *Rissetto v. Plumbers

and Steamfitters Local 343*, 94 F.3d 597, 604-05 (9th Cir. 1996) ("a favorable settlement is

equivalent to winning a judgment for purposes of applying judicial estoppel"); *B&M Linen Corp.

v. 222 Laundry LLC*, Adv. Proc. No. 12-1885-alg, 2013 Bankr. LEXIS 2832, at *24 (Bankr.

S.D.N.Y. July 12, 2013) (Gropper, J) ("The doctrine has been applied in bankruptcy cases where

judicial adoption of a party's position is implicit in and necessary for the court's approval of a

settlement or similar compromise.") (citation omitted).

In this case (as explained in the Trustee's moving papers), this doctrine precludes

Soundview Composite from taking positions inconsistent with the statements of Warren Martin

in his January 21, 2014 letter to the Court and at two hearings before the Court (January 21, 2014

and March 19, 2014), where he admitted the existence of a debt owed by Soundview Composite

to Soundview Elite in the amount of $3.87 million.  (*See* Trustee's Mem. at 20-25)  He made

those statements after conferring with Fletcher (as Fletcher has now admitted (*see* Fletcher Aff.

¶¶ 35-38)) and discussing their strategy for dealing with the then pending TRO application.  (*Id.*)

And it is apparent from Fletcher's recitation of that meeting, that Martin was speaking to Fletcher as the representative of Soundview Composite.  (Fletcher Aff. ¶¶ 36-38)

While Fletcher now professes "shock" at Martin's agreeing to "freeze" Soundview Composite's Wilmington Trust account (*id.* ¶ 37), he does not dispute in his affidavit the statements Martin made as to the existence or amount of the debt owed by Soundview Composite to Soundview Elite – Fletcher only objects to the "freeze."  (Fletcher Aff. ¶¶ 36-38) Nor does Fletcher ever assert that he did not review Martin's letter before it was sent – and he nowhere contends that the reference therein to such $3.87 million debt was inaccurate.  The fact is, Fletcher reviewed and approved Martin's letter the day before it was sent to the Court.[6]  And Fletcher nowhere states that he instructed Martin to correct any misstatements that he made to the Court.  Nor did he object to or instruct Martin to correct his reference to the Katz Affidavit in his letter where he wrote "the Soundview Debtors presented evidence at trial that Soundview Composite owes Soundview Elite that amount."  (Dailey Decl. Ex. B at 1)  Instead, Fletcher remained silent and was content to live with the favorable result Martin obtained in Court.[7]

Instead of offering evidence to dispute this admission as to the debt, Soundview Composite offers misdirection.  First, Defendant argues that it did not prevail in the prior proceedings and the JOLs' TRO application was not denied.  (Def. Mem. at 29-30)  This

---

[6]  The fee application submitted to the Court by the Porzio law firm reflect that Martin sent a draft of the letter to Fletcher and his team the day before it was filed with the Court, and they discussed it and the litigation strategy behind it.  The entry in Porzio's bill for January 20, 2014 under Warren Martin's name reads:  "Review emergency TRO motion (.3); e-mails to clients regarding same and suggested strategy (.3); prepare draft letter to court embodying suggested strategy and circulate to team (.4); telephone conference with A. Fletcher regarding same (.4)."  (First Interim Fee Application of Porzio, Bromberg & Newman, P.C., *In re Soundview Elite Ltd., et al*, No. 13-13098 (REG) (Bankr. S.D.N.Y.) [Docket No. 167], at 141)  The Court can take judicial notice of this document as it was filed with the Court (*see* fn 5 above) and the document reflects all the indicia or reliability required for its authentication and admission for purposes of this motion.  (*See* pp. 8-9 herein)

[7]  In trying to explain his and Ladner's silence at the March 19 hearing (when Martin again referenced this debt), Fletcher carefully states that "[a]t the time I spoke, no mention had been made about Composite or any alleged debt owed by Composite to Elite."  (Fletcher Aff. ¶ 38)  This is a dodge.  Immediately after Fletcher spoke, Martin mentioned this debt and its amount, and Fletcher and Ladner said nothing.  (Dailey Decl. Ex. C at 52-54).

contention, however, relies on a skewed view of the underlying litigations.  The issues addressed at the January 21, 2014 hearing initially arose through a Delaware interpleader action brought by Wilmington Trust, seeking a determination as to the disposition of funds it held on behalf of a number of so-called Richcourt entities, which at the time included both Soundview Composite and Soundview Elite.  In the Delaware case, fifteen such entities were collectively represented by Mr. Peter Harvey from the Patterson Belknap law firm.  (*See, e.g., Wilmington Trust, N.A. v. Soundview Elite Ltd.*, et al, C.A. No. N13C-06-156 (JTV) (Del. Sup. Ct.) (Docket No. 53328351 (Defs. Answer); *see also* Dailey Decl. Ex. B at 1)  These Richcourt entities eventually split into two camps, one of which (comprising nine of the funds) was controlled by Fletcher at the time.

Ultimately, six of the entities Fletcher controlled (the "Soundview Debtors") were placed into Cayman Islands winding up proceedings, where Joint Official Liquidators ("JOLs") were appointed for three of them.  (*See In re Soundview Elite Ltd., et al.*, No. 13-13098 (REG) (Bankr. S.D.N.Y.) [Docket No. 97])  Later, Fletcher placed these same Soundview Debtors into chapter 11 proceedings in this Court.  (*See id.*, at [Docket No. 1])  The JOLs appeared in the Soundview Debtors' U.S. Bankruptcy Court cases to move for their dismissal, oppose the appointment of a trustee, and seek injunctive relief as to assets held in Wilmington Trust.  (*See* [Docket No. 97])

In part, the JOLs were trying to preserve the funds owed to Soundview Elite by Soundview Composite so that, after they secured the hoped for dismissal, they could control such funds through the Cayman Islands winding up proceedings.  Thus, at the January 21, 2014 hearing, there were more issues before the Court than just the JOLs' attempt to enjoin Soundview Composite – it was, in effect, a fight over the proper forum for administering these estates.  And, in the end, viewing the totality of circumstances, the Fletcher entities clearly prevailed over the JOLs at that hearing.

-16-

Among other things, the Fletcher entities (i) defeated the JOLs' motion to dismiss (thereby allowing the chapter 11 proceedings to continue in the U.S. instead of the Cayman Islands), (ii) obtained instructions from the Court on the coordination of U.S. and Cayman Islands proceedings, and (iii) secured an order holding open the possibility of sanctions being imposed against the JOLs.  And, based on Martin's arguing that the entry of a TRO would have damaging collateral consequences for all entities within the "Fletcher team," (*see* Trustee's Mem. at 22; Dailey Decl. Ex. B at 2), the Court declined to enter a TRO.  As Martin expressed his clients' concerns about such collateral consequences in his letter,

> The repetition of loose allegations, found for example in this Emergency Motion, *e.g., see* paragraph 7, where it is stated that "The JOLs proved that the Fletcher team is untrustworthy, committed fraud, and mismanaged the funds of the Debtors," if such allegations are immediately followed by the entry of a TRO, could be used as evidence against the Debtor and its affiliates in other jurisdictions to establish that this Court sanctioned Soundview Composite and these Debtors for some unspecified improper conduct.

(Dailey Decl. Ex. B at 2)  This is the potential harm that might befall all Fletcher-controlled entities, including Soundview Composite, which Martin sought to avoid, and which he was successful in avoiding by defeating the TRO application.  The price Fletcher was willing to pay to avoid this potential harm to all of his entities, was Martin's promise of a "freeze" (which he conveyed after conferring with Fletcher on legal strategy (*see* Fletcher Aff. ¶ 36-37)).  The Court relied upon that promise in reaching its final decision as to all the applications before it, including the denial of the requested TRO.  To argue now that Fletcher was unsuccessful simply because the Soundview Composite account was frozen (as it had offered) is disingenuous.

Second, Soundview Composite contends that it is not bound by Martin's admission because it (*i.e.*, Soundview Composite) was not a named party in the January 21, 2014 hearing. (*See* Def. Mem. at 32-33)  This is wrong for several reasons.  Contrary to Soundview

Composite's assertion, Martin stated on the record who he represented: "the managers of the

Soundview debtors, who are my clients, are the identical managers of the [sic] Soundview

Composite, which is the entity that owns these funds, and we all recognize the debt … that runs

from Soundview Composite to Soundview Elite."  (Dailey Decl. Ex. A at 9:6-9; *see id.* Ex. B at

1-2 (similar statements in Martin's letter to the Court))  Thus, at the very least, his statements

were an admission by Soundview Capital Management, the "manager" and therefore the agent of

Soundview Composite.  Soundview Composite is bound by the admissions of its agent.[8]

Moreover, as noted, Martin made these representations to the Court after conferring with

Fletcher (as the ultimate owner of all Soundview entities, including specifically Soundview

Composite) on legal strategy.  (*See* Fletcher Aff. ¶¶ 36-38)  So this admission was made by

counsel at the behest of the ultimate principal of Soundview Composite, and it is bound thereby.

Indeed, by relaying and placing in issue his pre-hearing conversations with Martin, Fletcher has

waived any attorney client or work product privilege associated with Martin's representation of

Fletcher controlled entities.[9]  And because a party may not use privilege as a sword and a

shield,[10] Fletcher should not be allowed to rely for purposes of opposing this motion on only part

of what he discussed with Martin.  His attempt to do just that here, without disclosing all relevant

---

[8]    *See Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 213 (S.D.N.Y. 2009) (an agent's statements are attributed to the principal if the agent was acting in its capacity as an agent when it made the statements); *Amusement Indus. v. Stern*, 693 F. Supp. 2d 327, 344 (S.D.N.Y. 2010); *Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 453 (S.D.N.Y. 2007) ("An employer does not have to approve, or even be aware of, a representation made by an employee to be liable for that representation.  It is black-letter agency law in New York that an employer is liable for the representations of its agents when those representations are made within the scope of the agent's employment.")

[9]    *See Swift Spindrift, Ltd. v. Alvada Ins., Inc.*, 2013 WL 3815970 (S.D.N.Y. July 24, 2013) (quoting *In re County of Erie*, 473 F.3d 413, 428 (2d Cir. 2007)) (A "party may be held to have impliedly waived the privilege 'when a client testifies concerning portions of the attorney-client communication, ... when a client places the attorney-client relationship directly at issue, ... and when a client asserts reliance on an attorney's advice as an element of a claim or defense.'").

[10]    *See In re Adelphia Comms. Corp.*, 2007 WL 601452 (Bankr. S.D.N.Y. Feb. 20, 2007) (citing *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) ("The 'at issue' waiver doctrine prevents unfair use of the attorney-client privilege as a sword, to disclose only self-serving communications, and as a shield, to bar discovery of other communications that an adversary could use to challenge the truth of the claim.").

-18-

communications, retention agreements, legal analysis, etc. relating to the proceedings leading up to and including the January 21, 2014 hearing, should be disallowed.

Separately, contrary to Defendant's assertions, the fact that it was not a named party in the case before the Court at the time the admissions were made is not an absolute bar against applying the doctrine of judicial estoppel. Non-parties can be bound by that doctrine under circumstances like these. *See Shaw Family Archives Ltd. v. CMG Worldwide, Inc.*, 05 Civ. 3939 (CM), 2008 U.S. Dist. LEXIS 67529, at *4-29 (S.D.N.Y. Sept. 2, 2008) (judicial estoppel can apply to an entity in privity with the original party against which estoppel applies) (citing cases); *Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 996 (9th Cir. 2012) ("Because the doctrine of judicial estoppel is intended to protect the courts, we are particularly mindful that the '[i]dentity of parties is not is not a mere matter of form, but of substance. Parties nominally the same may be, in effect different; and parties nominally different may be, in legal effect, the same.'") (quoting *Chicago, Rock Island & Pac. Ry. Co. v. Schendel*, 270 U.S. 611, 620 (1926)); *Lia v. Saporito*, 909 F. Supp. 2d 149, 174-79 (E.D.N.Y. 2012) (applying judicial estoppel against parties not in the original proceeding because Lia, the party in the original proceeding, was the "sole principal" and therefore in privity with the other defendants).

In applying this analysis to questions of judicial estoppel, the court in *Milton H. Greene* relied on the Supreme Court's decision in *Taylor v. Sturgell*, 553 U.S. 880, 893-95 (2008), which identified factors to be considered in applying preclusive doctrines to non-parties. *See* 692 F.3d at 998. Those factors include: (1) a "close relationship" between the parties; (2) the present party's participation in the prior proceeding; (3) the party's "apparent acquiescence" in the effect of the prior proceeding; (4) "deliberate maneuvering" to avoid such effect; and (5) adequate representation of the present party by a party to the prior proceeding. *Taylor*, 553 U.S. at 888.

NYI-4593855v5

Here, those factors weigh in favor applying judicial estoppel to Soundview Composite. Soundview Composite is closely related to the Soundview Debtors named in the original litigation, indeed, they are all managed by the same entities and individuals and as such are in privity with each other. Soundview Composite (in the person of Fletcher) participated in meetings devising strategy for the prior proceeding, and its manager and ultimate owner (and his lawyer) participated in such proceeding and therefore were more than able to look out for its interests there. Soundview Composite acquiesced in the results of the prior proceeding – it accepted the favorable result obtained by Martin without correcting his supposed misstatements. And, as explained herein, the outcome of that prior proceeding was the product of deliberate maneuvering by Fletcher and the entities he controls. Thus, given the interconnections between the Fletcher-controlled entities here, judicial estoppel can and should be applied against them all.

## **CONCLUSION**

For the reasons set forth above and in her moving papers, the Trustee respectfully requests that the Court issue an Order granting the relief requested in her moving papers.

Dated:  June 20, 2014                                    JONES DAY
        New York, New York


                                          By:    /s/  Veerle Roovers
                                                Veerle Roovers
                                                Stephen Pearson
                                                Amy Edgy Ferber
                                                222 East 41st Street
                                                New York, New York 10017
                                                Telephone: (212) 326-3939
                                                Facsimile: (212) 755-7306

                                                *Attorneys for the Chapter 11 Trustee*

-20-