UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re                                    :        Chapter 11
                                         :
SOUNDVIEW ELITE LTD., *et al.,*          :        Case No. 13-13098 (REG)
                                         :
              Debtors.                   :        (Jointly Administered)
-------------------------------------------------------x
                                         :
CORINNE BALL, as Chapter 11 Trustee of   :
SOUNDVIEW ELITE LTD.,                     :
                                         :
              Plaintiff,                  :        Adv. Proc. No. 14-01923 (REG)
                                         :
              v.                          :
                                         :
SOUNDVIEW COMPOSITE LTD.,                 :
                                         :
              Defendant.                  :
-------------------------------------------------------x


DECISION ON MOTIONS FOR SUMMARY JUDGMENT
AND ASSET FREEZING PRELIMINARY INJUNCTION


APPEARANCES:

JONES DAY
*Counsel for Plaintiff Corinne Ball, as Chapter 11*
*Trustee of Debtor Soundview Elite Ltd.*
222 East 41st Street
New York, New York 10017
By:    William J. Hine, Esq.  (argued)
       Veerle Roovers, Esq.


LAW OFFICE OF PETER M. LEVINE
*Former*[1] *Counsel for Defendant Soundview Composite Ltd.*
99 Park Avenue, Suite 330
New York, New York 10016
By:    Peter M. Levine, Esq. (argued)

---

[1]    After the filing of his brief and oral argument on the summary judgment elements of this decision, Mr. Levine sought permission to withdraw from his representation of defendant Soundview Composite Ltd.  His motion was granted.

SHER TREMONTE LLP
*Successor Counsel for Defendant Soundview Composite Ltd.*
80 Broad Street, Suite 1301
New York, New York 10004
By:     Robert Knuts, Esq.[2]

---

[2]     Mr. Knuts filed a brief on the asset-freezing injunction elements of this decision.  The Court did not need, nor hold, oral argument as to these.

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

In the chapter 11 cases of debtors Soundview Elite Ltd. ("**Elite**") and its affiliates

(collectively, and with Elite, the "**Soundview Debtors**"), plaintiff Corinne Ball (the

"**Trustee**") was appointed chapter 11 trustee for the Soundview Debtors after this Court

removed Alphonse Fletcher ("**Fletcher**") and others under Mr. Fletcher's control from

possession.[3]  Until the Soundview Debtors needed to be liquidated (in the Cayman

Islands, under which they were organized, and the United States, where they were

headquartered), the Soundview Debtors were investment companies—"open ended

mutual funds"[4]—taking investor money and placing that money in other investments.

One such investment (in this case, by debtor Elite, one of the six companies that

are debtors in this chapter 11 case) was in another investment company, defendant

Soundview Composite Ltd. ("**Composite**"), which is not a debtor in this Court.  As of the

time of the events relevant here, Composite was also under Mr. Fletcher's control, and it

remains under Mr. Fletcher's control.

In this adversary proceeding under the umbrella of the Soundview Debtors'

chapter 11 cases, the Trustee, on behalf of debtor Elite, sues to recover the "**Owed

Amount**," *i.e.*, the net asset value of Elite's investment—which effectively is everything

---

[3]     *See In re Soundview Elite, Ltd.,* 503 B.R. 571 (Bankr. S.D.N.Y. 2014) (Gerber, J.) (the "**Trustee
        Decision**") (addressing a number of issues in this case, including the appointment of a chapter 11
        trustee).

        Earlier, in a distinct, but related, chapter 11 case involving another investment fund controlled and
        managed by Mr. Fletcher, *In re Fletcher Int'l Ltd of Bermuda.,* No. 12-12796 (Bankr. S.D.N.Y.
        case filed June 29, 2012), referred to by the parties, and eventually this Court, as "**FILB**," the
        Court likewise appointed a trustee—in that case, Richard Davis, Esq. (the "**FILB Trustee**).  For
        further background with respect to some of FILB matters, see *In re Fletcher Int'l Ltd*, 2014 Bankr.
        LEXIS 2558, 2014 WL 2619690 (Bankr. S.D.N.Y. June 11, 2014) (Gerber, J.).

[4]     Decl. of Alphonse Fletcher, Jr. Pursuant to Local Rule 1007-2, filed 9/24/2013 (Main Case
        ECF No. 2) ("**Fletcher Rule 1007-02 Decl.**"), ¶ 4.

Composite would have after the payment of Composite's creditor liabilities,[5] since Elite

is the only shareholder with an economic interest in Composite[6]—after Elite made a

redemption request that Composite repeatedly acknowledged but now refuses to honor.

The Trustee also seeks a preliminary injunction (replacing a consensual hold on Elite's

assets that was put into place when this controversy first came up) freezing Composite's

assets to avoid their dissipation.

More specifically, the Trustee seeks (i) turnover, under sections 541 and 542 of

the Bankruptcy Code, of the net asset value of Elite's holdings; (ii) an accounting;

(iii) attorneys' fees, costs, and litigation expenses, and (iv) other relief that the Court

considers proper.

The Trustee now moves, pursuant to Fed.R.Bankr.P. 7056 and Fed.R.Civ.P. 56,

for summary judgment—though this might better be regarded as partial summary

judgment, because (as the Trustee readily acknowledges) the Debtor's redemption

entitlement—while to the entirety of Composite's remaining assets—is to those assets

after the payment of any senior third-party creditor claims, which are not yet known with

precision.

---

[5]     As discussed below, Elite's contractual entitlement is to the net asset value ("**NAV**") as of the
close of business on the relevant quarterly redemption date, not the time of any payment or of any
judicial determination. And because the value of Composite's assets has gone down since the
redemption request was made, the amount Composite now could pay, net of its expenses, would
be less than Elite's entitlement at the earlier time. Obviously, Composite cannot pay more than it
has. Thus the Trustee's entitlement on behalf of Elite, Composite's only shareholder, is
effectively to everything Composite would still have left after Composite's payment of any more
senior creditor claims.

[6]     Composite has shareholders of two types—those with voting rights (Mr. Fletcher, and/or people or
entities Mr. Fletcher controls), and those who, like the average holder of shares in a mutual fund,
might contribute money or property into Composite (*e.g.*, Elite), but have no voting power. Only
the shareholders in the latter category have the right to redeem their investments, and Elite is the
only one of them. Hereafter, instead of accompanying "shareholder" with the qualifier "with an
economic interest" every time, the Court will simply refer to Elite as Composite's only
shareholder.

-2-

Composite's position—*i.e.*, Mr. Fletcher's position—is inexplicable, and offensive to the Court. It is obvious that once any existing senior Composite liabilities have been satisfied, the entire remaining balance of Composite's assets rightfully belongs to Elite. That Elite made a redemption request has been repeatedly acknowledged by persons and entities acting for Mr. Fletcher, or entities under Mr. Fletcher's control. Mr. Fletcher, acting through companies he controlled, was on both sides of the redemption request at the time it was made. But Mr. Fletcher (who, as noted, still controls Composite) nevertheless refuses to return Elite's investment—or what is left of it.

On behalf of Composite, Mr. Fletcher contends that almost all of the evidence supporting the redemption request is inadmissible, and that what is admissible is "ambiguous"; that he can find no record of the redemption request and (though he and his staff were on both sides of the transaction at the time, and repeatedly acknowledged it before) cannot remember it; and that he isn't sure whether, assuming any redemption request was made, the request complied with necessary formalities. Mr. Fletcher also contends that Composite has the right, under "gating"[7] provisions in the investment documents, to "gate" Elite's redemption request—even though there are no other Composite shareholders to protect; gating here would serve no purpose; and he offers no evidence to support the notion that Composite took any action to gate this redemption request.

Sooner or later, the Trustee will win. But Mr. Fletcher's resistance to meeting his obligations to his investors, and constraints on the statutory and constitutional authority

---

[7]    "Gating" or "gate" provisions authorize managers of investment funds to limit the amount of withdrawals on shareholders' requested redemptions as a means of protecting the fund, to avoid a run on the bank and protect other shareholders.

of a bankruptcy judge to enter a final order bringing the resistance to an end, have tied

this case up in knots.

To minimize the delay Fletcher's resistance has occasioned, and given how

obvious her entitlement (at least in overall terms) is, the Trustee has sought to recover her

entitlement by the Bankruptcy Code's "Turnover" provision, section 542 of the Code.

But for reasons discussed below, the Trustee's entitlement is not one that section 542 can

enforce, and her main entitlements are to declaratory relief, an accounting, and a related

judgment—as to which a bankruptcy judge cannot enter a final order.  And the Court also

needs to quantify Composite's creditor claims before it can fix the amount of the

inevitable judgment.  The most the Court can grant at this point is partial summary

judgment (though this, because it is not a final order, is fully within the Court's statutory

and constitutional authority) and an injunction freezing Composite's assets until the

issues are fully determined and (as is certain) the Trustee ultimately wins.

The Court grants each, for the reasons described below.

<u>Facts</u>

Under familiar principles, the Court relies solely on undisputed facts.

A.    *The Composite Articles of Association and*
      *Private Placement Memorandum*

Composite was formed in May 2007 under the "Articles of Association of

Soundview Composite, Ltd." (the "**Composite Articles**").[8]  That same month, Composite

issued a Confidential Private Placement Memorandum (the "**Placement Memorandum**")

---

[8]      Affidavit of Alphonse Fletcher, Jr. ¶ 4, dated June 16, 2014 (ECF No. 19) ("**Fletcher Aff.**").

-4-

setting forth the terms and conditions of a stock offering by which Composite would offer six classes of non-voting shares.[9]

Among other things, the Placement Memorandum described shareholders' entitlement to redeem their shares.  As described in the Placement Memorandum, a shareholder has the right to redeem some or all of its Composite shares on any quarterly redemption date by sending a facsimile request for redemption to Composite's subadministrator.[10]  The Composite Articles prescribe that any redemption request:

> "[(i)] shall be in writing,
>
> [(ii)]shall specify the number and Class of Participating Shares to which it relates or indicate the manner in which the number of Participating Shares to be redeemed is to be determined and
>
> [(iii)]shall be signed by the holder thereof…"[11]

The Placement Memorandum established that redemptions may only be made on the last business day of each calendar quarter (each, a "**Redemption Date**"), and that a redemption request must be received at least 45 days prior to a Redemption Date in order for the redemption to be honored on that date.[12]  Unless waived by the directors of

---

[9]    Trustee's Statement of Undisputed Material Facts ¶ 1, dated May 19, 2014 (ECF No. 12) ("**Trustee's Undisputed Facts**"); Response of Defendant to the Trustee's Statement of Undisputed Material Facts ¶ 1, dated June 16, 2014 (ECF No. 20) ("**Def. Response to Undisputed Facts**").

[10]    Def. Response to Undisputed Facts ¶ 8; Private Placement Memorandum of Soundview Composite Ltd., dated May 14, 2007, at 30, attached as Exh. D to the Declaration of Michael J. Dailey, dated May 19, 2014 (ECF # 14) ("**Dailey Decl.**").

[11]    Composite Articles ¶ 29(c), attached to the Fletcher Aff. as Exh. 1.

[12]    Placement Memorandum at 31-32, attached to the Dailey Decl. as Exh. D.

Composite, a redemption request received within 45 days of a Redemption Date would be deferred until the subsequent Redemption Date.[13]

The Placement Memorandum also provided that redemption of shares is "contingent upon the Fund having sufficient assets to discharge its liabilities on the Redemption Date," and that the "maximum Net Asset Value of Shares that may be redeemed on any Redemption Date is 10% of the Net Asset Value of the Fund, unless such limitation is waived by the Directors in their sole discretion."[14]  The Composite Articles also included a limitation of this kind as follows:

> If one or more Redemptions Requests are received in respect of any one Redemption Day that would, if satisfied, result in the redemptions of an amount equal to more than 10% of the total net asset value of the Company or any Master Fund, the Directors may determine in their absolute discretion to reduce the amount of each Redemption Request so that Redemption Requests represent in aggregate an amount equal to no more than 10% of the total net asset value of the Company or any Master Fund.[15]

The Placement Memorandum also stated that Composite's directors could suspend redemptions and the determination of Net Asset Value under certain circumstances.[16]

Absent such restrictions on redemptions, the Placement Memorandum required payment of "not less than 90% of the estimated value of the Shares requested to be redeemed" to be made within 40 days following the Redemption Date of redeemed

---

[13]     *Id.*

[14]     *Id.* at 32.

[15]     Composite Articles at ¶ 29(j).

[16]     Placement Memorandum at 34.  While it has not been asserted that Composite ever suspended its redemptions, Fletcher has indicated that Composite suspended its determination of Net Asset Value in March 2011 without providing any evidence of that suspension.  *See* Fletcher Aff. ¶ 24. As discussed below, *see infra* pages 56-57, the determination of the Net Asset Value of Composite's shares by audit is not essential to determining the amount that must be returned to Elite, or any other issues decided by Court in this opinion.

shares, with "the remaining balance of the net redemption proceeds" being paid "within

ten Business Days after the official Net Asset value of the applicable Class is

published."[17]  The Placement Memorandum granted Composite the right to make

redemptions "in kind"—*i.e.*, by providing securities it owned instead of cash.[18]  And the

Placement Memorandum also provided that "[s]hares also may be redeemed at such other

times on such terms and conditions as the Directors, acting in their sole discretion, may

decide."[19]

In August 2009, Elite subscribed to Composite shares issued under the Placement

Memorandum, purchasing 15,311 Class H Shares for approximately $12.87 million (the

"**Composite Shares**").[20]  Since it purchased the Composite Shares, Elite has been the

*only* holder of Composite shares, holding 100% of the nonvoting interest in Composite--

or, putting it another way, the entirety of Composite's net asset value.[21]

B.      *Ownership and Control of Elite, Composite
        and Soundview Capital Management*

As described in the Placement Memorandum, the investment manager of

Composite was (and so far as the record reflects, still is) Soundview Capital Management

(the "**Management Company**").[22]  Until it was at least effectively displaced upon the

appointment of a chapter 11 trustee, the Management Company was also the investment

manager for Elite and the other Soundview Debtors.  In addition to serving as investment

---

[17]      Placement Memorandum at 31.

[18]      *Id.* at 31.

[19]      *Id.* at 30.

[20]      Trustee's Undisputed Facts ¶¶ 2, 19; Fletcher Aff. ¶ 6.

[21]      Trustee's Undisputed Facts ¶ 21; Def. Response to Undisputed Facts ¶ 21.

[22]      Placement Memorandum at 1.

manager for each of Elite and Composite, the Management Company also owned all the

voting shares (which it will be recalled were non-economic) of Composite.[23]

The Management Company is owned by Richcourt Holding, Inc. ("**Richcourt**"),

at least 85% of which has been owned since June 2008 (through several parent entities)

by Fletcher Asset Management, wholly owned by Mr. Fletcher.[24]  Since September 4,

2013, Mr. Fletcher has served as a director of the Management Company, Composite,

and (though this would have little meaning after the appointment of the Trustee) Elite.[25]

The Management Company—"*Soundview* Capital Management"—is a company

distinct from "*Fletcher* Asset Management," whose activities were a focus of the FILB

chapter 11 case.  But both are under the control of Mr. Fletcher, and on the first day of

the umbrella chapter 11 cases here, Mr. Fletcher made reference to the Soundview

Debtors' ownership structure "following the acquisition of the [Soundview] Debtors by

Fletcher Asset Management and affiliates."[26]  The organizational chart Mr. Fletcher

attached to his declaration showed Fletcher Asset Management at the top of the

ownership structure, owning (directly and through an entity of which it was general

---

[23]     Def. Response to Undisputed Facts ¶¶ 4, 18.

[24]     Fletcher Aff. ¶ 4.  On June 12, 2008, Fletcher Asset Management (the same entity that, until it was
displaced by a trustee, managed FILB) and affiliates purchased 85% of the Management Shares of
the "Limited Debtors" (three of the Soundview Debtors, of which one was Elite) and certain other
entities.  Fletcher Rule 1007-Decl. ¶ 9.

[25]     Fletcher Aff. ¶ 1.

[26]     Fletcher Rule 1007-2 Decl. ¶ 10 ("Attached hereto as Exhibit C, is a copy of an organizational
chart as it exists today following the acquisition of the Debtors by Fletcher Asset Management and
affiliates.").  A copy of that organizational chart is attached as Appendix A.

Fletcher Asset Management was frequently referred to as "**FAM**".  Mr. Fletcher's Rule 1007-2
Declaration in the umbrella case here showed as assets of Elite and other debtors in the umbrella
chapter 11 case approximately $5.2 million in "FAM Related Investments."  *See id.* Schedule 3,
"Assets."

partner) 100% (or in one case, 85%) of the entities below it, including the Management

Company, and (with "100% Voting Control of Each") each of the Soundview Debtors.

In June 2008, two of Mr. Fletcher's associates, Messrs. Denis Kiely ("**Kiely**") and

Stewart Turner ("**Turner**"), were appointed directors of each of Composite and Elite.

Messrs. Kiely and Turner were also directors of the Management Company in July

2011,[27] although their dates of appointment are not in the record.  Mr. Kiely resigned as

director of each of Elite and Composite in November 2011, and Mr. Turner resigned as

director of each of Elite and Composite in June 2012.  In June 2013, Mr. Kiely was

replaced by Floyd Saunders ("**Saunders**"), and Mr. Turner was replaced by George

Ladner ("**Ladner**")—each also an associate of Mr. Fletcher's.[28]  For a three-month

period from March 26, 2013 through June 12 (or 19), 2013, Deborah Hicks Midanek, of

the Solon Group Inc., served as a "non-management" director of Elite, Composite, and

the other Richcourt funds.[29]  As stated by Mr. Fletcher, Ms. Midanek "resigned from the

Debtors on June 19, 2013.  Midanek's resignation came after the Debtors' Boards had

removed her as a Director on June 12, 2013."[30]

C.     *Requests for Redemption of Composite Shares*

Composite has confirmed that it redeemed all shares owned by Composite's

original shareholder on March 31, 2009 after that investor delivered a redemption request

on February 12, 2009.[31]  In July 2010, Elite delivered a redemption request for

---

[27]     Fletcher Aff. ¶ 8.

[28]     Trustee's Undisputed Facts ¶ 24; Fletcher Aff. ¶ 4; Def. Response to Undisputed Facts ¶¶ 23, 24, 28

[29]     Def. Response to Undisputed Facts ¶ 26.

[30]     Fletcher Rule 1007-2 Decl. ¶ 14.

[31]     Fletcher Aff. ¶ 6.

approximately half of its Composite holdings at the time. That request was honored, and Elite thereby reduced its holdings in Composite to 7,191.06 shares.[32]

The Trustee asserts (and the Court ultimately finds, though with less precision as to the exact date) that a redemption request (the "**Redemption Request**") for Elite's remaining holdings was sent "[o]n or around July 2011" to HSBC Bank (Cayman) Limited ("**HSBC**"), the fund administrator for Composite at the time.[33]  HSBC resigned as Composite's administrator on July 25, 2011.[34]  Pinnacle Fund Administration LLC ("**Pinnacle**") became the successor administrator for Composite and Elite as of January 1, 2013.[35]

The Trustee—who had not yet been appointed by 2011, and, once appointed, needed to obtain the Soundview Debtors' documents from Fletcher-controlled entities— could not, and did not, present a copy of the Redemption Request to the Court.  Mr. Fletcher has stated in an affidavit on this motion that he searched the files of Composite and the Management Company (though not those of HSBC) and his search did not yield a copy of the Redemption Request.[36]  The Redemption Request has not been found in the records of Pinnacle Fund Administration LLC, to whom all relevant files were said to have been sent by HSBC.[37]  The record does not reflect whether or not HSBC—the entity most likely to have been the recipient of the redemption request—now has a copy.

---

[32]     Def. Response to Undisputed Facts ¶¶ 31-32.

[33]     Trustee's Undisputed Facts ¶ 36.

[34]     Fletcher Aff. ¶ 5.

[35]     *Id.* (and *sic.*).  The Court notes the substantial gap period.

[36]     Fletcher Aff. ¶ 10.

[37]     Fletcher Aff. ¶ 14.

To date, Composite has declined to honor, and has not honored, the Redemption

Request.[38]

D.      *Asserted Admissions re*
        *Elite's Redemption Request*

In support of her motion for summary judgment, the Trustee relies on eight

separate communications (by letter, e-mail, affidavit, or statements in court on the record)

from 2012 to 2014 (all but one preceding the appointment of the Trustee) acknowledging

the Redemption Request, discussing the gating of redemptions of Composite shares, or

both.  The Court's review of exhibits submitted on this motion, but addressed less

extensively by either side, revealed three more.  Composite argues that all but two of

them must be ignored by the Court, as inadmissible in evidence.  The Court addresses the

evidentiary issues, and thus the extent to which they may be considered on the motions

here, in the Discussion to follow.  For now, it sets forth the content of each of them.

1.      *May 2012 Loeb E-Mail*

On May 10, 2012, Ann Loeb, an employee of Richcourt USA—which provided

administrative services for the Richcourt Funds, including Elite and Composite—sent an

e-mail (the "**May 2012 Loeb E-Mail**") to Alan de Saram (Cayman Islands counsel for

Elite; for at least several other Soundview Debtors; and, most importantly, for

Composite), along with Messrs. Turner, Saunders, and other employees of the Richcourt

or Fletcher entities.[39]  E-mails and a letter surrounding it, also submitted to the Court,

confirm that the May 2012 Loeb E-Mail was transmitted incident to a group effort to

formulate responses to a May 2, 2012 request by the Cayman Islands Monetary Authority

---

[38]    Trustee's Undisputed Facts ¶¶ 66-67.

[39]    E-Mail Chain from de Saram to Loeb Discussing and Attaching Draft of Letter to Cayman Islands
        Monetary Authority, May 10, 2012, attached to the Dailey Decl. as Exh. F.

-11-

(often referred to in correspondence and elsewhere as "**CIMA**") for information as to

several matters, including the Fletcher Funds' processing of redemptions.[40]

The May 2012 Loeb E-Mail stated that

> Soundview Composite was never suspended or
> gated.  There was no reason to since it only has no
> [*sic.*] outside investor.  It's [*sic.*] only investor is
> Soundview Elite, which requested a full
> redemption.

> Mike can you please provide Alan with the date that
> Elite submitted its full redemption request to
> Soundview Composite.

*2.    May 2012 de Saram Letter*

On the next day, May 11, 2012, Mr. de Saram sent a letter (the "**May 2012**

**de Saram Letter**") to CIMA delivering the information that was the subject of the May

2012 Loeb E-Mail on the day before.  Mr. de Saram stated:

> This letter concerns Soundview Composite Ltd.

> We have been asked by the Board of Directors of
> the Fund [Composite] to respond on its behalf to
> your letter dated 2 May 2012.

> In the time available it has not been possible to deal
> with all of your queries in detail requested, but we
> have endeavoured to answer your questions
> (repeated below) to the best of our ability.

> We will deal with your queries to each question
> with our answers in bold type below the question.[41]

In response to CIMA's fourth inquiry,[42] Mr. de Saram wrote:

---

[40]   *See* the May 12 de Saram Letter, sent the next day, which quoted CIMA's questions, and then,
following each, provided Composite's response.

[41]   *See* Dailey Decl. Exh. G. at 1.

[42]   The fourth inquiry said:

> 4.  Please submit a copy of each redemption request that
> remains outstanding, including any subsequent or additional

-12-

> The Fund is unable to submit a copy of each
> redemption request, as these redemption requests
> were made directly to the administrator in
> accordance with standard operating procedure.
> However note that the sole investor in the Fund
> [Composite] is Soundview Elite, which has put in a
> redemption request which is outstanding.[43]

In response to CIMA's fifth inquiry,[44] Mr. de Saram wrote:

> With respect to the Fund [Composite], it has not
> been gated or suspended.  It has one investor,
> Soundview Elite Ltd.[45]

### 3.     *May 2013 Midanek Letter*

Solon Group, Inc. ("**Solon**") was appointed by each of the Richcourt Funds,

including Composite, as a "non-management director" in March 2013 (about 10 months

after the communications just quoted), and Ms. Deborah Midanek represented Solon in

its director role.[46]

---

[ ]     redemption requests by each redeeming investors [*sic.]* of the
Funds.

    *Id.*

[43]     *Id.*

[44]     The fifth inquiry said:

> 5.  We refer to 2008 Audited Financial Statements for the
> Funds whereby it is noted that the respective Board of
> Directors suspended the calculation of Net Asset value,
> subscription and redemptions.  We note further that certain
> redemptions were fulfilled by way of redemption in-kind
> through shares in special purpose vehicles, namely Elite
> Designated Ltd., Star Designated Ltd. and Premium
> Designated Ltd.
>
> Please confirm whether or not the suspensions for each Funds
> [*sic.*] have been terminated and if not, please confirm how the
> Directors intend to fulfill their obligations to redeeming
> investors.

    *Id.*

[45]     *Id.* at 2.

[46]     *See* Dailey Decl. Exh. H at 1; Fletcher Aff. ¶ 25.

-13-

On May 28, 2013 (now about a year after the communications just quoted, at a
time when she was still a director of Composite and had not yet either "resigned" or
"been removed"), Ms. Midanek sent an eight-page single-spaced letter (the "**May 2013
Midanek Letter**") to CIMA, with respect to six investment funds, including Elite and
Composite,[47] of which she and Mr. Fletcher were directors.  Expressing concerns as to
"the condition of the Funds I serve," Ms. Midanek asked CIMA to consider removing
Mr. Fletcher, to allow the funds "to perform their obligations to their shareholders and
redemption creditors."[48]

For the most part, Ms. Midanek's statements as to Mr. Fletcher and his
management of the six funds that were the subject of Ms. Midanek's letter are not
relevant to this controversy, and the Court makes no findings with respect to them.  They
are relevant here only with respect to Ms. Midanek's statements as to pending
redemptions and gating.  In that connection, Ms. Midanek stated, in a section captioned
"Funds' Condition," that:

> Following my appointment, as I then learned more
> about the status of the Funds, I learned that most of
> the Funds had not been able to calculate a net asset
> value report ("NAV") since December 31, 2010 and
> none later than March 31, 2011; that many
> redemption requests received since then had not
> been honored, that redemptions had not been
> suspended even after it had been determined that
> NAVs had not or could not be calculated and
> redemption obligations continued to crystallize….[49]

In the next section, "Current Situation," Ms. Midanek stated that she had
"attempted to compile, on a Fund by Fund basis, all available information on assets,

---

[47]   Dailey Decl. Exh. H at 1.

[48]   *Id.*

[49]   *Id.* at 2.

shareholders, directors, governing documents, valuation dates, most recent NAV and

minute books and registers,"[50] and she followed that with a table providing some of that

information.  For each of the six funds, she listed "Last NAV," "Last Audited Accounts,"

and "Redemptions (Holders)."  For Composite (the fourth fund she showed), she listed

dates in the boxes for "Last NAV" and "Last Audited Accounts," respectively, of "31

March 2011" and "2008."  More importantly, in the box for "Redemptions (Holders),"

she entered:

> 100% shareholder placed a full redemption request
> for trade date September 30, 2011.[51]

### 4.    June 2013 Siedlecki E-Mail

The May 2013 Midanek Letter triggered a response from CIMA, dated June 6,

2013, seeking more information.  CIMA desired a response within a week.[52]  The same

day the CIMA letter was received, Michael Padarin, at the Walkers law firm in the

British Virgin Islands, sent CIMA's letter to Ms. Midanek (who was still a director at the

time) and Mr. Fletcher with a view to compiling the information CIMA had requested.[53]

The CIMA letter then went from Mr. Fletcher to Mr. Saunders, who sent it on to Michael

Siedlecki, a Richcourt employee working with them, on the following Monday.

By e-mail dated June 10, 2013 (the "**June 2013 Siedlecki E-Mail**"), Mr.

Siedlecki circulated draft responses.  Two, with respect to CIMA's Inquiries #4 and #5,

dealt with redemptions and gating.  Mr. Siedlecki stated:

> 4.  Only Soundview Elite, Soundview Premium, and
> Soundview Star have gated redemptions.  However,

---

[50]     *Id.* at 3.

[51]     *Id.* at 4.

[52]     Attached to the Dailey Decl. as Exh. J. at 13.

[53]     *Id.*

> none of the Funds has a recent NAV or has paid out
> redemption proceeds for quite some time … The
> latest final NAV for Soundview Composite and
> New Wave Fund is as of March 31, 2011 and
> neither fund has paid out any redemption proceeds
> since that date.
>
> 5.  I'm not sure how the Directors intend to address
> the pending redemption requests.[54]

### 5.    June 2013 Fletcher E-Mail

The May 2013 Midanek Letter also triggered a desire on the part of Mr. Fletcher

and Composite's remaining leadership to address it. On June 26, 2013, Mr. Fletcher sent

an e-mail (the "**June 2013 Fletcher E-Mail**") to his fellow director Mr. Turner—it being

remembered that by this time, Solon and Ms. Midanek had either resigned or been

dismissed from that directorship.  Mr. Fletcher asked Mr. Turner to draft a letter, on

behalf of the Cayman Richcourt funds (which included Composite) to be sent to CIMA,

"to address the derogatory letter that Deborah sent to CIMA."[55]  The letter Turner was

instructed to draft was to "incorporate the information from Michael's earlier email

below"[56]—*i.e.*, the June 2013 Siedlecki E-Mail, which included Michael Siedlecki's

statements that only Elite, Premium and Star had gated redemptions—significantly

leaving out Composite.

### 6.    July 2013 Turner E-Mail

The work by Mr. Fletcher and his colleagues to submit a response to CIMA

continued after the June 2013 Fletcher E-Mail.  On July 1, 2013, Mr. Turner sent an

e-mail (the "**July 2013 Turner E-Mail**") reporting that "after following up with Michael

---

54    *Id.* at 12.

55    Dailey Decl. Exh. J. at 11.

56    *Id.*

-16-

Siedlecki, I have made some factual changes and inserted two tables" into the letter that

would be sent to CIMA.  Mr. Turner's revised letter stated, among other things, that

"Soundview Capital Management Ltd. ("SCM") [is] the Investment Manger to

Soundview Composite Ltd., Soundview Elite Ltd., Soundview Premium Ltd. and

Soundview Star, Ltd....."[57]  Mr. Turner then included a table:[58]

| | # of Outstanding Redemption Requests | Estimated Value of Outstanding Redemption Requests |
|---|---|---|
| … | | |
| Soundview Composite Ltd. | 1 | $5,000,000 |
| … | | |

The July 2013 Turner E-Mail then stated that each of Elite, Premium and Star had

gated redemptions, but once again did not include Composite in that list.  Mr. Turner

continued that "[n]one of the Funds have suspended redemptions but due to the delays

caused by the outgoing administrator, HSBC, to forward materials to Pinnacle,

redemptions are not currently being processed at this time."[59]

Finally, as relevant here, the July 2013 Turner E-Mail included another table in

which Mr. Turner stated that the estimated value of Composite's portfolio was

$5.155 million.[60]

---

[57]     *Id.* at 4.

[58]     *Id.* at 4.

[59]     *Id.* at 5.

[60]     *Id.*

-17-

### 7.    *June 2013 Midanek Letter*

Meanwhile, Ms. Midanek responded by the deadline CIMA had set.  On June 13,

2013 (which, as noted above,[61] was after Mr. Fletcher states that Solon was removed as a

director, though before it resigned), Ms. Midanek sent a second letter to CIMA (the

"**June 2013 Midanek Letter**") which, among other things, responded to CIMA's letter

of June 6.[62]

In the June 2013 Midanek Letter, Ms. Midanek still referred to Solon ("via its

President, Deborah Hicks Midanek") as a director, though the June 13, 2013 date

appearing on the letter is the day after Mr. Fletcher says that Solon was removed.  (It is

not clear whether Ms. Midanek was unaware of the other directors' actions in attempting

to remove Solon as a director, or simply disputed their power to do so; later in the letter,

she stated that Mr. Fletcher "indicated his desire to terminate the directorship of the

Solon Group," but she expressed the view that any such effort would be invalid.)[63]

In any event, the June 2013 Midanek Letter provided a table of redemption

requests received by each fund since the last redemption was paid,[64] which showed, for

Composite, "Estimated Net Assets" of $6.36 million; "Estimated Redemptions Pending"

of $6.36 million; and "Estimated Remaining Net Assets" of zero.

Mr. Fletcher admits that this amount is also shown within the shareholder register,

but contends that it is merely an estimate.[65]

---

[61]      *See* page 9 *supra*.

[62]      Dailey Decl. Exh. K at 5.

[63]      *Id.*

[64]      Attached to the June 2013 Midanek Letter at p. 58 as Exhibit A4.

[65]      Fletcher Aff. ¶ 24.

8.    *July 2013 Richcourt Funds Letter*

By letter dated June 10, 2013 (but which all agree should read *July* 10, 2013,

when it was actually sent), six Richcourt Funds, including Elite and Composite,[66] sent the

letter to CIMA (the "**July 2013 Richcourt Funds Letter**") upon which they had been

working since June 10.[67]  In accordance with instructions that Mr. Fletcher had given

during the preparation of July 2013 Richcourt Funds Letter drafts,[68] the July 2013

Richcourt Funds Letter was not signed by named human beings, but simply by the six

funds.  One of the signatories was Elite, and another was Composite.[69]

At least in respects relevant here, the July 2013 Richcourt Funds Letter was not

materially different than Turner's July 1 draft.  It stated that, as of the date of that letter,

Composite had one "pending" or "outstanding" redemption request with an estimated

value of $5 million,[70] and that the directors of the Richcourt Funds intended to "complete

the Richcourt Funds' financials and then appropriately satisfy the pending redemptions in

accordance with the governing documents."[71]

---

[66]     Elite, Composite, Soundview Star Ltd., Soundview Premium Ltd., Pitagora Fund Ltd., and New
Wave Fund SPC (collectively, the "**Richcourt Funds**").

[67]     Letter to Cayman Islands Monetary Authority, June 10, 2013, attached to the Dailey Decl. as Exh.
J. at 15-16.

[68]     *See id.* at 2 ("We're sending it signed by the funds rather than directors.").

[69]     *Id.* at 16.

[70]     The reason for showing only $5 million, as contrasted to the $6.36 million Ms. Midanek had
shown four weeks earlier, was not stated.  Necessarily, the difference must be attributed to
different perceptions of the value of the assets then at Composite; of liabilities of Composite; or
some combination of the two.

[71]     Dailey Decl. Exh. J. at 15-16.

The July 2013 Richcourt Funds Letter also stated that "[e]ach of Soundview Elite

Ltd., Soundview Premium Ltd., and Soundview Star Ltd. [but once more, not Composite]

has gated redemptions.  None of the Richcourt Funds has suspended redemptions."[72]

   9.    *December 2013 Katz Affidavit*

Under an order entered in November 2013, CohnReznick Advisory Group

("**CohnReznick**") was retained as financial advisor for Elite.[73]  Bernard A. Katz, a

partner at CohnReznick, told this Court, in an affidavit dated December 2, 2013 ("**Katz**

**Affidavit**"), that the value of Elite's redemption receivable owed to it by Composite was

approximately $3.875 million as of July 31, 2013.[74]  The Katz Affidavit was submitted

on behalf of Elite in connection with the evidentiary hearing on the motion to appoint a

chapter 11 trustee for Elite.[75]

   10.    *January 2014 Martin Letter*

On January 21, 2014, Warren Martin, Jr. (a partner of Porzio Bromberg &

Newman P.C. ("**Porzio**"), counsel for Soundview Debtors before the Trustee was

appointed) sent a letter (the "**January 2014 Martin Letter**") to this Court.[76]  Responding

to an "Emergency Motion" by the Cayman Liquidators (referred to in the letter, and thus

here, as the "**JOLs**"), that letter stated:

> The Soundview Debtors-in-possession did not
> receive a phone call or any advance notice of the
> request by the purported JOLs which has now been
> made via the above-referenced "Emergency
> Motion" filed last evening.  Had such a phone call

---

[72]    *Id.* at 16.

[73]    Main Case ECF No. 96, attached to the Dailey Decl. as Exh. E.

[74]    *Id.* at 6.

[75]    *Id.*

[76]    Main Case ECF No. 151, attached to the Dailey Decl. as Exh. B.

> been made, consent would have been provided
> immediately.  The Soundview Debtors support
> preserving and protecting non-debtor affiliate
> Soundview Composite's funds of approximately
> $3.874 million, *particularly given the fact that the*
> *Soundview Debtors presented evidence at trial that*
> *Soundview Composite owes Soundview Elite that*
> *amount* (Katz Affidavit, Doc. No. 96 at page 8 of
> 10, at row 8 of 9) and *particularly given the fact*
> *that both the Debtors and non-Debtor Soundview*
> *Composite are managed by the same entity,*
> *Soundview Capital Management.*[77]

After another paragraph, in which Mr. Martin advised this Court that the Soundview

Debtors supported a more durable "freeze" of the funds than was suggested in the

Cayman Liquidators' motion,[78] the January 2014 Martin Letter continued:

> Third, the Soundview Debtors, *together with non-*
> *Debtor Soundview Composite, which again is*
> *managed by the same manager as the Soundview*
> *Debtors,* would prefer to embody the freeze and the
> two tweaks addressed above via a consensual
> amendment to the Wilmington Trust Order
> previously entered by this Court, which non-debtor
> Soundview Composite has agreed it will sign onto.

Mr. Martin continued:

> The Soundview Debtors wish to avoid entry of any
> TRO under these circumstances out of concerns
> over continued damage they might suffer among
> creditors and investors as a result of the entry of a
> TRO.  The repetition of loose allegations, found for
> example in this Emergency Motion, *e.g., see*
> paragraph 7, where it is stated that "The JOLs
> proved that the Fletcher Team is untrustworthy,
> committed fraud, and mismanaged the funds of the
> Debtors," if such allegations are immediately
> followed by the entry of a TRO, could be used as
> evidence against the Debtor *and its affiliates* in

---

[77]      *Id.* at 1 (emphasis added).

[78]      *Id.* at 2.  The Soundview Debtors suggested, instead, that "Composite's funds be preserved 'until
further order of the Court specifically addressing use of the Soundview Composite Funds.'"  *Id.*
(internal quotation marks in original).

other jurisdictions to establish that this Court
sanctioned *Soundview Composite* and these Debtors
for some unspecified improper conduct.[79]

11.    *March 2014 Martin Statements*

At a March 19, 2014 hearing before this Court in Elite's underlying chapter 11

case (shortly after the Trustee had been appointed), the Court considered a motion filed

on February 21, 2014, about a month earlier (the "**Administrative Expense Motion**"),[80]

for payment of administrative expenses assertedly incurred while the Soundview Debtors

were still in possession—including fee requests by Porzio, Mr. Fletcher, Mr. Ladner, Mr.

Saunders, and the Management Company.  The motion explained that:

> As each of the Debtors is structured, and is common
> in the investment fund industry, none of the Debtors
> ever had any direct employees.  Rather, services
> were provided to the Debtors by associated
> management companies and unassociated service
> providers, as well as by the Debtors' officers and
> directors.[81]

The motion continued that although the former Debtors in Possession (who now called

themselves "Debtors Out-of-Possession"[82]) considered bringing a "comfort order"

application for authority to make the requested payments while they were still in

possession, they chose not to do so.  They made that decision, Mr. Martin explained,

because with the exception of one expert witness, "each of the third-party contractors,

who were essentially serving as the Debtors' "employees", were insiders…."[83]

---

[79]    *Id.* at 2 (emphasis added).

[80]    Main Case ECF No. 192.

[81]    *Id.* ¶ 5.

[82]    *Id.* at p. 1.

[83]    *Id.* ¶ 7.

The motion listed the people "behind the entities, so to speak,"[84] including

Messrs. Fletcher and Ladner—who

> served as the captains of the ship during the four-
> month period that these Debtors were debtors-in-
> possession.  This included frequent and continued
> participation in lengthy daily conference calls with
> the Debtors' counsel and financial advisors, making
> determinations as to the direction of the case,
> directing the Debtors' counsel and financial
> advisors and addressing all of the day to day
> problems that arose during the case.[85]

Further on, the Administrative Expense Motion—which it will be recalled was filed on

behalf of Messrs Fletcher, Ladner, Saunders and the Management Company—stated that:

> In general terms, Soundview Management [*i.e.*, the
> Management Company] directed the efforts of the
> Debtors' counsel and financial advisors on all
> matters pertaining to the estate's investments, which
> stated differently, means estate assets.[86]

The "estate's investments" included, of course, Elite's investment in Composite.

When speaking to the assets that would be available to pay the requested fees, Mr.

Martin made statements relevant to this controversy on the record and in open court.[87]  In

those statements (the "**March 2014 Martin Statements**"), Mr. Martin stated:

> I neglected to [address] one of Your Honor's
> questions, which was about seeing the full extent of
> the table being set as to administrative claims.
> There's 22 million in unencumbered cash; a 10- or
> 11 million dollar claim against FILB, which
> remains to be worked out, and Ms. Ball is obviously
> working on that; and 9 million dollars of third-party
> securities. None of the assets are encumbered.

---

[84]    *Id.* ¶ 10.

[85]    *Id.* ¶ 10, first bullet point.

[86]    *Id.* ¶ 17.

[87]    *See* Tr. of Hrg. of 3/19/2014 (Main Case ECF No. 242).

> And so I would sincerely—and in addition to that,
> there's another—*there's a 3.8-million-dollar*
> *receivable from a related entity, which Your Honor*
> *will recall my last act in the case before Your*
> *Honor's ruling was to get the consent of that entity*
> *to freeze that 3.8 million dollars so that the trustee*
> *can pursue that receivable.*[88]

Although the hearing was attended by Messrs. Fletcher, Ladner, and Turner (each

of whom was seeking to be paid under the Administrative Expense Motion), none of

them corrected or supplemented anything Mr. Martin said.  The "related entity" described

in the last-quoted paragraph of Mr. Martin's remarks was of course Composite.  But

Composite contends that Mr. Martin's statement is inadmissible—a contention addressed

in the discussion to follow.

E.    *Prior Proceedings in Chapter 11 Case*
      *and Here*

The Soundview Debtors' chapter 11 case was filed on September 24, 2013,[89] just

prior to a previously-scheduled hearing to be held on the same day in the Grand Court of

the Cayman Islands with respect to winding up proceedings filed by creditors of each of

the Soundview Debtors.  At the hearing in the Cayman Islands, the Cayman Grand Court

entered winding up orders appointing Joint Official Liquidators—the JOLs—with respect

to each of Debtors Elite, Soundview Premium, Ltd. and Soundview Star, Ltd.

Early in the chapter 11 cases, the Soundview Debtors sought to use the

Bankruptcy Code's automatic stay to prevent the Cayman winding up proceedings from

---

[88]    *Id.* at 54 (transcription error corrected; written-out numbers changed to Arabic form for
        readability; emphasis added).

[89]    *See* Petition, filed 9/24/2013 (Main Case ECF No. 1).

-24-

moving forward.[90]  In response, the JOLs sought to dismiss the chapter 11 cases so that

the Cayman proceedings could continue down there.  After litigation on the issues, this

Court ruled, among other things, that it should not dismiss the chapter 11 cases, but that it

should direct the appointment of a chapter 11 trustee.[91]

The Trustee commenced this adversary proceeding on April 1, 2014, with the

filing of a complaint here in the bankruptcy court.  On May 2, 2014, Composite filed an

answer to the complaint, and a motion to withdraw the reference.[92]  On May 19, 2014

(before the motion to withdraw the reference had been decided), the Trustee filed her

motion for summary judgment.

On July 3, 2014, Judge Scheindlin of the district court denied Composite's motion

to withdraw the reference, without prejudice.[93]  She observed, among other things, that a

summary judgment determination, which would decide purely questions of law, would be

subject to *de novo* review in any event, and that judicial economy and efficiency favored

determination of the issues here in the bankruptcy court.[94]

---

[90]       *See* Fletcher Rule 1007-2 Decl. ¶ 24 ("This proceeding is filed firstly, in order to obtain the benefit
          of the automatic stay and provide the enhanced procedural and substantive protections that U.S.
          Courts provide to creditors and all parties of interest.").

[91]       *See* Trustee Decision, *supra* n.3, 503 B.R. at 581-83.

[92]       ECF # 8.

[93]       *See Ball v. Soundview Composite Ltd. (In re Soundview Elite Ltd.),* 2014 U.S. Dist. LEXIS 91267,
          *1, 2014 WL 2998529, *1 (S.D.N.Y. July 3, 2014) (Scheindlin, J).

[94]       2014 U.S. Dist. LEXIS 91267 at *20-21, 2014 WL 2998529 at *4.

Discussion

I.

Authority of a Bankruptcy Judge to Rule Here

Without dispute, this Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. § 1334.[95]  But a second provision of the Judicial Code, 28 U.S.C. § 157, addresses the extent to which bankruptcy judges (who are appointed under Article I of the Constitution, in contradistinction to district judges, who are appointed under Article III) are empowered to "hear and determine"—*i.e.*, to issue final judgments and orders in—proceedings that fall under the subject matter jurisdiction of the district and bankruptcy courts.  There are limits to the authority of bankruptcy judges to enter final judgments and orders in the matters over which they have subject matter jurisdiction, under the Constitution[96] and by statute.

---

[95]      District courts and bankruptcy courts exercise jurisdiction in bankruptcy-related matters—including those in this adversary proceeding—under one of the several provisions of the Judicial Code (title 28 of the U.S. Code) in which federal trial courts are granted subject matter jurisdiction.  The Judicial Code's provision conferring subject matter jurisdiction for consideration of bankruptcy-related matters, 28 U.S.C. § 1334 (which directly follows like-provisions granting subject matter jurisdiction in federal question, diversity and admiralty cases), confers original subject matter jurisdiction on district courts (and, accordingly, on bankruptcy courts, which are units of the district court under 28 U.S.C. § 151) with respect to bankruptcy cases and proceedings.  Section 1334(e) gives courts sitting in bankruptcy *exclusive* jurisdiction over property of debtors' bankruptcy estates, while section 1334(b) grants such courts with "original but not exclusive" jurisdiction over "civil *proceedings* arising under title 11, or arising in or related to cases under title 11"—which include, in addition to contested matters in cases, adversary proceedings like this one.  Accordingly, there are three types of original jurisdiction that district (and hence bankruptcy) courts may exercise under § 1334, colloquially referred to as "arising under," "arising in," and "related to" jurisdiction.

At the least, this Court has "related to" jurisdiction, because a result favorable to Elite would benefit the Elite estate and Elite's creditors, easily satisfying the broad test for such jurisdiction articulated by the Third Circuit in *In re Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984) and applied in this circuit in *Publicker Industries Inc. v. U.S.A. (In re Cuyahoga Equip. Corp.)*, 980 F.2d 110, 114 (2d Cir. 1992).

[96]      *See Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) ("***Marathon***"); *Stern v. Marshall*, 564 U.S. ___, 131 S.Ct. 2594 (2011) ("***Stern***").  Those limits do not require further discussion here.

That same 28 U.S.C. § 157, addressing bankruptcy judges' statutory authority, grants authority to bankruptcy judges to hear and determine matters in "cases under title 11" (*e.g.,* the Elite chapter 11 case) and in proceedings arising under title 11 or arising in a case under title 11—*e.g.*, this adversary proceeding—if they are "core." "Core proceedings "include, but are not limited to" 16 enumerated categories of proceedings,[97] which nearly entirely relate to bankruptcy courts' historic core functions.

A.    *Limits on Use of the Turnover Power*

The limits on bankruptcy judges' powers to decide disputes when estates seek to augment their assets and bring claims arising under state or other nonbankruptcy law can delay litigation. In an effort to shortcut such litigation delays, the Trustee relies on the Bankruptcy Code's "Turnover" provision, Bankruptcy Code section 542. That section, captioned "Turnover of property to the estate," provides, in relevant part (with exceptions not relevant here):

> (a) … [A]n entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title … shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

> (b) … [A]n entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

---

[97]    28 U.S.C. § 157(b).

And 28 U.S.C. § 157, in recognition of bankruptcy courts' historic *in rem* jurisdiction, and bankruptcy courts need to bring in and administer property of the estate, lists "orders to turn over property of the estate" as included within core proceedings.[98]

But "mere characterization of an action as a complaint for turnover does not mean that it is a turnover action pursuant to 28 U.S.C. § 157(b)(2)(E))."[99] To have the statutory and constitutional power to issue a final order that the Turnover Power provides,[100] a bankruptcy judge does not need to conclude that the estate will prevail, either in full or in any particular respect. But the bankruptcy judge does need to be comfortable that the Turnover Power has been properly invoked. This presents a threshold issue that doesn't impede the Trustee's ability to ultimately win, but may require this Court to make a Report and Recommendation before a final order can be entered by the district court.

This Court addressed the conceptual underpinnings of turnover actions in its opinion in *Pali Holdings*,[101] and that discussion need not be repeated in comparable length here. As explained more fully in *Pali Holdings*, turnover actions assist the bankruptcy court in the exercise of its *in rem* jurisdiction by enabling trustees to marshal the *existing* assets of an estate for the benefit of the estate's creditors.[102] Under section 542's first subsection, section 542(a), turnover of property may be sought and obtained by what is in substance a federal right of replevin—a right to recover the estate's property

---

[98]     *See* 28 U.S.C. § 157(b)(2)(E).

[99]     *Shea & Gould v. Red Apples Companies, Inc. (In re Shea & Gould)*, 198 B.R. 861, 865 (Bankr. S.D.N.Y. 1996) (Garrity, J.) ("***Shea & Gould***").

[100]    *Stern* makes clear that the constitutional and statutory limits are not necessarily the same, and that a claim that is a core matter under 28 U.S.C. § 157 may nevertheless be beyond a bankruptcy judge's constitutional power to issue a final order. But the distinction does not matter here.

[101]    *Geron v. Peebler (In re Pali Holdings, Inc.)*, 488 B.R. 841 (Bankr. S.D.N.Y. 2013) (Gerber, J.) ("***Pali Holdings***").

[102]    *See id.* at 851-53.

in kind, with the ability to get the value of the property as a substitute.[103]  Section 542's

second subsection, section 542(b), provides what is in substance a mechanism for

monetizing a receivable that is property of the estate.[104]  "Each, importantly, provides a

means for the estate to secure the benefits of property that *already* is property of the

estate."[105]

Where the turnover power is properly invoked, it is simply an effort to recover

property—or *on* property—that is *already* property of the estate. That invokes the court's

*in rem* jurisdiction over the bankruptcy *res.*[106]

But as this Court explained in *Pali Holdings*, "the turnover power can be

improperly invoked, especially when it is used as a Trojan Horse for bringing garden

variety contract claims; when the property in question is not already property of the

estate; or when the turnover statute is used to recover assets with disputed title when the

estate's claim of ownership is legitimately debatable. It is well established that the

turnover power may not be used for such purposes."[107]

Though the matter is close—as the Court finds Composite's defenses here to be

largely frivolous, and the Court cannot even find that they are *bona fide*—the Court

nevertheless is not in a position to determine that the cash or property to be delivered to

---

[103]     *Id.* at 849.

[104]     *Id.*

[105]     *Id.*  Thus, section 542(b) can be used to monetize estate assets such as notes or accounts receivable
        that are already property of the estate.  *Id.  Pali Holdings* was a garden-variety example of that.

[106]     *See id.* at 851-52.

[107]     *Id.* at 851 n.39.  *See also In re Fairfield Sentry Ltd.,* 458 B.R. 665, 683 (S.D.N.Y. 2011) (Preska,
        C.J.) ("Numerous courts have therefore held that an action is non-core when property which is the
        subject of a significant dispute between the parties is sought to be recovered through a turnover
        action.... These actions are subject to significant dispute, resolution of which will determine
        whether the funds redeemed are in fact property of the Funds' estates.") (citations and internal
        quotations omitted).

Elite is *already* estate property.  And though (as discussed above and below), Elite's redemption request has repeatedly been acknowledged to be pending and unpaid, and has been quantified in concept, the uncertainties as to the amount to be turned over make use of the turnover power inappropriate.[108]  Unlike the entitlement to payment on an account receivable or a promissory note, which is simply to be converted into cash, Elite does not yet own the redemption proceeds, and its entitlement here is not yet equivalent to recovery of a fixed sum, or tantamount to substituting one kind of asset for another.

As tempting as it is to push the statutory and constitutional envelope here given the conduct of Fletcher, the Management Company and others acting for Composite, the Court does not believe that it should stretch the turnover power that far.  Prudence suggests that bankruptcy judges be wary of pushing the limits of their statutory and constitutional authority to avoid more problems of the type occasioned by *Stern*.

The Trustee may pursue her claims by a host of alternative means, but she cannot do so by means of the Turnover Power.  Construing its turnover authority to avoid the Constitutional issue, the Court determines that her claims are non-core matters.  And for that reason, the Court cannot enter the final judgment that 28 U.S.C. § 157(b)(2)(E) would permit a bankruptcy judge to enter if the Turnover Power were appropriately invoked.

---

[108]    See *Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.),* 325 B.R. 134, 137–38 (Bankr. S.D.N.Y. 2005) (Bernstein, C.J.) (citing law holding, among other things, that an action should be regarded as a turnover "only when there is no legitimate dispute over what is owed to the debtor") (citations omitted); *Shea & Gould,* 198 B.R. at 867 (issuing report and recommendation, instead of final judgment, in debtor's action to recover fees for legal services rendered to the debtor, where court was doubtful that claim was sufficiently "specific in its terms as to amount due and date payable," and observing that "[a] turnover action may be inappropriate where the debtor's claim lacks such certainty").

B.     *What a Bankruptcy Judge May Nevertheless Do*

Though the Trustee is unable to invoke the Turnover Power, that does not mean

that Composite can stymie, especially for more than a short time, her efforts to enforce

Composite's obligations.  The Court can still issue a Report and Recommendation.[109]

Additionally, the limits on bankruptcy judges' ability to enter final orders and

judgments do not apply in situations where (as here, for reasons discussed below) a

bankruptcy judge is issuing an order granting only *partial* summary judgment.[110]  Even

after *Marathon*, *Stern* and their progeny, a bankruptcy judge can still issue interlocutory

orders, even in proceedings in which a bankruptcy judge does not have authority to issue

a final judgment.[111]

A partial summary judgment that is not dispositive of claims is an interlocutory

order, and doesn't implicate the constitutional limitations on the Court's authority to enter

final judgments.[112]  As explained in *Kane & Kane*:

> In this order, the Court grants partial summary
> judgment in favor of the Trustee…. Because this
> order is not dispositive with regard to all of the
> claims addressed in this adversary proceeding, and
> the Court will not enter partial judgment as a result

---

[109]   *See* 28 U.S.C. § 157(c)(1) ("A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11.  In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.").

[110]   *Bakst v. U.S.A. (In re Kane & Kane)*, 479 B.R. 617, 633-34 (Bankr. S.D. Fla. 2012) (Kimball, J.) ("***Kane & Kane***"); *West v. Peterson (In re Noram Res., Inc.)*, 2012 Bankr. LEXIS 2991, *3-4, 2012 WL 2571154, *1 (Bankr. S.D. Tex. July 2, 2012) (Isgur, J.) ("***Noram Resources***").

[111]   *Noram Resources,* 2012 Bankr. LEXIS 2991, at *3-4, 2012 WL 2571154, at *1.

[112]   *Id.; Kane & Kane,* 479 B.R. at 633-34 (a partial summary judgment order was not a final order for purposes of *Stern v. Marshall* analysis).  *See also West v. WRH Energy Partners LLC (In re Noram, Inc.),* 2011 Bankr. LEXIS 5183, *3, 2011 WL 6936361, *1 (Bankr. S.D. Tex. Dec. 30, 2011) (Isgur, J.) (same, vis-à-vis a motion to dismiss under Rule 12(b)(6), where less than all claims were dismissed).

> of this ruling, this order "does not end the action as
> to any of the claims or parties and may be revised at
> any time before the entry of a judgment
> adjudicating all the claims and all the parties' rights
> and liabilities." Fed.R.Civ.P. 54(b), made
> applicable to this adversary proceeding by Fed. R.
> Bankr.P. 7054(a). This order is not a final order....
> Thus, even if the causes of action presented here
> would not be subject to entry of final judgment in
> this Court, the present order is not a "final
> judgment" subject to the Article III concerns
> addressed by the Supreme Court in *Stern.*[113]

For reasons discussed below, the Court is not now in a position to award a money

judgment in a fixed amount in favor of the Trustee. The more limited relief the Court

now grants does "not end the action as to any of the claims or parties...."[114] Thus, any

partial summary judgment order this Court might enter would not be a "final judgment,"

subject to the Article III concerns addressed in *Stern*.[115]

## II.

### Summary Judgment

Composite's defense to summary judgment here effectively rests on two things.

First, Composite argues that of the eight (and, the Court finds, now eleven) separate

communications acknowledging Elite's redemption request; the absence of gating; the

approximate amount owed to Elite; or some combination of those things, *only two* are

admissible in evidence—and that those two are too ambiguous to support Elite's

entitlement.

---

[113]     *Kane & Kane,* 479 B.R. at 633-34.

[114]     *Id.*

[115]     *See Stern,* 131 S.Ct. at 2615, 2620 (specifically limiting the Supreme Court's analysis to "final judgments").

Second, Composite submits an affidavit by Mr. Fletcher (who individually and through the Management Company, controls Composite, as he previously controlled Elite), saying that he does not recall making the Redemption Request, and that he has looked for it and now cannot find it—though significantly (especially since Fletcher and companies and personnel he controlled were on both sides of the Redemption Request, and the request was made to the prior administrator HSBC, whose files Mr. Fletcher failed to check and repeatedly stated had not been fully turned over), *he never says that the Redemption Request was not in fact made*.  Then, based on Fletcher's artful affidavit and its efforts to exclude the Trustee's evidence, Composite argues that the Trustee has not proven her case, or that there remain material disputed issues of fact.  The Court disagrees.

The Court determines first that of the 11 items, 8 are admissible.  The Court further determines that Mr. Fletcher's crafty responses do not raise issues of fact as to Elite's entitlement, except as to the exact amount that Elite is owed.  Partial summary judgment in the Trustee's favor is appropriate now.

A.    *Evidentiary Issues*

Preliminarily, the Court must address Composite's contentions that the Trustee has moved for summary judgment "[r]elying on inadmissible documents and hearsay statements,"[116] and that only two of the eleven admissions supporting the Trustee's motion can be considered by the Court.[117]  Composite argues that documents have not

---

[116]    Composite Memorandum of Law In Opposition to Trustee's Motion for Summary Judgment (ECF No. 21) ("**Composite SJ Br**.") at 1.

[117]    Composite then goes on to argue that the remaining record — "three sentences in two letters written well after the alleged transaction," *id.* — is "ambiguous."  But the Trustee's showing is supported by a great deal more than "three sentences in two letters," and even if it were (given what those letters said), the Court sees no ambiguity at all.  *See* page 45 below.

been satisfactorily authenticated,[118] though Composite is vague as to which, and never says that any particular document is not authentic.  Composite also contends that six of the communications on which the Trustee relies are hearsay.

It is clear, of course, that on a motion for summary judgment, parties may rely only on evidence that would be admissible at trial.[119]  But on the merits of the evidentiary objections, the Court overrules the authentication contention in its entirety.  The Court sustains the hearsay objection with respect to two of the challenged communications (and excludes a third document on relevance grounds), and overrules it with respect to the remainder.

### 1.    Authentication

As one of the predicates for its assertions that most of the evidence offered against it is inadmissible, Composite argues that in order to be considered on this motion, each of the documents upon which the Trustee relies had to be authenticated through an affidavit or declaration made upon personal knowledge.[120]  The Court disagrees.

To address this, a court must focus on what Civil Rule 56(c)(2), quoted above,[121] actually says.  It provides for the exclusion of matter that cannot be presented in a form that would be admissible in evidence—not that it is *not so* presented.  *Collier*'s chapter

---

[118]    Composite SJ Br. at 11.

[119]    Fed.R.Civ.P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").  Fed.R.Civ.P. 56 is applicable in bankruptcy adversary proceedings under Fed.R.Bankr.P. 7056.  Hereafter the Court refers only to Civil Rule 56 or other Civil Rules, without additional reference to Bankruptcy Rules, like Bankruptcy Rule 7056, that make the Federal Rules of Civil Procedure applicable in adversary proceedings.

[120]    *See* Composite SJ Br. at 16-17.

[121]    *See* n.119 *supra*.

on dealing with summary judgment in bankruptcy adversary proceedings makes this

exact point, in so many words.[122]  *Collier* then continues:

> It has been held, properly, that authentication of a
> document is not required at the summary judgment
> stage, and that is particularly proper in bankruptcy
> litigation.  A different rule would result in often
> unnecessary expense for creditors and other
> stakeholders, and impose requirements inconsistent
> with efficient bankruptcy administration, in which
> relevant contractual documents are frequently
> submitted with no more than an attorney's affidavit
> or declaration attaching them to present them to the
> court.  But other evidentiary objections (such as
> those that a document cannot *ever* be authenticated
> or is hearsay, and could not, under any
> circumstances, be admissible) can provide bases for
> a court's determination not to consider them under
> Civil Rule 56(c)(2).

Composite understandably does not argue that the matter on which the Trustee

relies could never be authenticated.  While *bona fide* evidentiary objections can and

should be considered at the summary judgment stage (which is why the Court considers

each of the hearsay objections below), as to authenticity there is no basis for concluding

that any of the documents is anything other than what it purports to be.  And the fact that

documents were attached to an attorney declaration without a supplemental affidavit by a

document custodian or another with knowledge does not make them inadmissible for that

reason.[123]  To the extent the authenticity of the matter here presented to the Court is not

obvious (as it is with respect to the January 2014 Martin Letter sent to the Court, and the

---

[122]   10 *Collier on Bankruptcy* ("***Collier***") ¶ 7056.05 (16th ed. 2015) ("[I]t is important to note that
Civil Rule 56(c)(2) provides that a party 'may object that the material cited to support or dispute a
fact *cannot* be presented in a form that would be inadmissible in evidence,' not that it *is not* so
presented.") (emphasis in original).

[123]   *See Lebewohl v. Heart Attack Grill LLC*, 890 F. Supp. 2d 278, 297-99 (S.D.N.Y. 2012)
(Engelmayer, J.) ("***Lebewohl***") (admitting documents downloaded from the Internet without an
accompanying affidavit from document custodians).

transcripts of proceedings in this Court), there is no reasonable basis for concluding that the evidentiary material could *never* be authenticated; it simply would be time-consuming and expensive to do so.

And even at trial, under Federal Rule of Evidence 901(b), a document may be authenticated based on its "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances," the issue being whether a reasonable juror could find the evidence in question authentic.[124] A similar analysis can and should be performed at the summary judgment stage when a party raises a colorable authentication objection, but here such an objection is frivolous.

By declaration,[125] Jones Day associate Michael J. Dailey described in great detail the process by which the documents upon which the Trustee relied were obtained from Mr. Fletcher; Fletcher Asset Management; personnel working for each; Pinnacle (the funds' Administrator); and the Porzio firm, which had received documents from each.[126] Mr. Dailey then stated that the documents attached to his declaration, having been received by that means, were "true and correct"[127]—which effectively means "unaltered." Having considered that declaration—which states, among other things, that the Trustee presented documents obtained from the very people now raising issues as to the documents' authenticity—the Court has no doubts whatever that they are authentic.

---

[124]   *See, e.g., Lebewohl*, 890 F. Supp. 2d at 298 (admitting documents attached to the declaration of a party's attorney, after discussing each of Rules 901(a) and 901(b) and noting that "[t]he bar for authentication of evidence is not particularly high").

[125]   ECF #14.

[126]   *Id.* ¶¶ 3-11.

[127]   *Id.* ¶ 13.

*2. Hearsay*

The Court then considers the 11 individual documents and other forms of

evidentiary matter to determine the extent to which any is inadmissible under the Hearsay

Rule.

*1.     May 2012 Loeb E-Mail*

Ms. Loeb was an employee of Richcourt USA at the time she sent the e-mail, and

the employees of Richcourt USA provided administrative services to Composite,

reporting to the directors of Soundview Capital Management, the investment manager for

Composite.   More fundamentally, Ms. Loeb and the others with whom she was

communicating (including Composite directors Turner and Saunders, Mr. de Saram,

counsel for Composite and other Soundview funds, and her Richcourt colleague, Michael

Siedlecki) were working together to formulate responses to CIMA—including with

respect to redemption requests, which were among Richcourt's areas of responsibility.

The May 2012 Loeb E-Mail plainly reflects the role of Ms. Loeb and Mr.

Siedlecki as team members (and agents) in that collective effort.   As a Richcourt

employee with at least partial responsibility for advising the directors of the Management

Company about redemption requests,[128] Ms. Loeb's statements were well within the

scope of her role at Richcourt USA.[129]

---

[128]     *See Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 537 (2d Cir. 1992).

[129]     *See id.* at 538 ("The authority granted in the agency relationship need not include authority to
make" the specific statement at issue, "but simply the authority to take action about which the
statements relate."); *Union Mut. Life Ins. Co. v. Chrysler Corp*., 793 F.2d 1, 8 (1st Cir. 1986)
(There is nothing in Rule 801(d)(2)(D) that requires an admission be made by a management level
employee. A lower level employee, may make admissions under Rule 801(d)(2)(D) based on
information he acquired through his employment, so long as the employee doesn't lack the
authority to make the routine admission.).

The Court flatly disagrees with Composite's contention that the e-mails comprising Exhibit F to the Dailey Declaration, including the May 2012 Loeb E-Mail, "are not party admissions, because they contain statements made on behalf of Elite, not Composite."[130]  The e-mail chain was part of the collective effort to prepare the "Soundview letters," relating to Elite, Premium, Star *and Composite*, that were to be sent to CIMA on behalf of all of the Richcourt Funds, and the May 2012 Loeb E-Mail directly addressed issues with respect to the Composite response.

The Court especially disagrees with Composite's contention insofar as it covers the May 2012 Loeb E-Mail itself—whose last two paragraphs expressly make reference to Composite; state facts with respect to Composite; and seek more information with respect to Composite—all for the purpose of the response to CIMA that was the subject of the team's joint effort, on behalf of Composite and other Fletcher Funds.

The Court therefore rejects Composite's arguments that the May 2012 Loeb E-Mail is inadmissible.  The May 2012 Loeb E-Mail is not hearsay because it satisfies the requirements under Fed. R. Evid. 801(d)(2)(D) that a party must establish "(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that [the statement] relates to a matter within the scope of the agency."

The May 2012 Loeb E-Mail is admissible, and will be considered on this motion.

---

[130]      *See* Composite SJ Br. at 4.

2.    *May 2012 Letter de Saram Letter*

Mr. de Saram was an attorney for Composite; his response concerned his client
Composite; he was asked by Composite's Board to respond to the Cayman Authorities
earlier letter; and he was doing so on Composite's behalf.

Understandably, Composite does not object to the admissibility of the May 2012
de Saram Letter.[131]  Having been written by Composite's counsel, on Composite's
behalf, to respond to CIMA's inquiry to Composite, it is a classic admission, falling
squarely under Fed. R. Evid. 801(d).[132]  It is not hearsay for that reason.   The May 2012
de Saram Letter is admissible, and will be considered on this motion.

3.    *May 2013 Midanek Letter*

Ms. Midanek was a director of, among other funds, Composite.  In that role, Ms.
Midanek had a legal obligation to serve the company and its shareholders, with which she
was attempting to comply.  The May 2013 Midanek Letter provided information to the
Cayman Authority in furtherance of what Ms. Midanek perceived as her and Composite's
obligations to its stakeholders.

The May 2013 Midanek Letter clearly related to matters of legitimate concern to
any corporate director; Mr. Fletcher's disapproval of her whistle-blowing does not
change that fact.  She was a director with the right, if not also the duty, to act in good
faith to protect stakeholder interests.

And it does not matter that Ms. Midanek did not personally issue redemption
requests, or handle other administrative matters.  She had a legitimate concern as to

---

[131]    *See* Composite SJ Br. at 1.

[132]    *See* in particular Fed. R. Evid. 801(d)(2)(C) (excluding from hearsay a statement "made by a
person whom the party [against whom the statement is offered] authorized to make a statement on
the subject") and 801(d)(2)(D) (excluding from hearsay a statement "made by a party's agent or
employee on a matter within the scope of that relationship and while it existed").

whether Composite and the other funds were meeting their obligations to their investors—if for no reason other than CIMA could be anticipated to expect as much.

The May 2013 Midanek Letter is an admission.  It is admissible, and will be considered on this motion.

### 4.    *June 2013 Siedlecki E-Mail*

The hearsay analysis with respect to the June 2013 Siedlecki E-Mail is very much the same as with respect to the May 2012 Loeb E-Mail.  At the time he sent the June 2013 Siedlecki E-Mail, Mr. Siedlecki (like Ms. Loeb) was a Richcourt employee, dealing with the administrative end of Composite's business.  And here too, more fundamentally, Mr. Siedlecki was communicating incident to the team effort to formulate a submission to CIMA—including with respect to redemption requests, which were among Richcourt's areas of responsibility.   The June 2013 Siedlecki E-Mail plainly reflects his role as team member in that collective effort.  His discussion of facts to be incorporated into the letter then being drafted was well within the scope of his responsibilities.

The June 2013 Siedlecki E-Mail is an admission.  It is admissible, and will be considered on this motion.

### 5.    *June 2013 Fletcher E-Mail*

Mr. Fletcher made the statements in the June 2013 Fletcher E-Mail in the scope of his own employment, for each of the funds (including Composite) for whom he was acting.  Mr. Fletcher's statements also confirm that Mr. Siedlecki, when he made the statements in the June 2013 Siedlecki E-Mail, was acting within the scope of Mr. Siedlecki's employment as well.

The June 2013 Fletcher E-Mail is an admission.  It is admissible, and will be considered on this motion.

6.    *July 2013 Turner E-Mail*

The hearsay analysis with respect to the July 2013 Turner E-Mail is closely similar to that with respect to the June 2013 Fletcher E-Mail, and especially the June 2013 Siedlecki E-Mail and the earlier May 2012 Loeb E-Mail. At the time he sent the July 2013 Turner E-Mail, Mr. Turner was a Composite director and working on Composite business. And more fundamentally, here too, Mr. Turner was communicating incident to the team effort to formulate a submission to CIMA—including with respect to redemption requests. The July 2013 Turner E-Mail plainly reflects his role as team member in that collective effort. His discussion of facts to be incorporated into the letter then being drafted was well within the scope of his responsibilities.

The June 2013 Turner E-Mail is an admission. It is admissible, and will be considered on this motion.

7.  *June 2013 Midanek Letter*

The Court is mindful of Solon's—and hence Ms. Midanek's—status as a Composite director at the time of many of the key events in question here, and is likewise mindful of its ruling that her earlier May 2013 Midanek Letter, written in her capacity as such and to advance the welfare of Composite stakeholders, was well within her authority and admissible as an admission.

But the hearsay issue here is more difficult, because while Ms. Midanek once more wrote CIMA as the Solon director of Composite (among other funds), the Composite Board, at least purportedly, had terminated Solon's status as such the preceding day. And while Ms. Midanek knew of Mr. Fletcher's intent to remove Solon from its directorship, and while she said any such effort would be improper, the Court is reluctant to allow the admission of a document premised on Solon's status as a director at

-41-

the time that she wrote it when the Court would first have to find either that Mr.

Fletcher's statement that Solon had been removed the preceding day was false, or that its

removal was legally invalid—a determination that presumably would have to be made

under Cayman law, with no help from either side on what Cayman law provides with

respect to that issue.

Some hearsay exceptions rely on considerations of reliability, but this one does

not; it rests on status—as an agent of a corporate party. It appears that rightly or

wrongly, Mr. Fletcher and his fellow director Mr. Saunders determined to take away Ms.

Midanek's status as a director-agent who could speak for Composite. Whether that firing

of a troublesome whistleblower was a breach of fiduciary duty (or an additional breach of

fiduciary duty) does not appear to be relevant to the evidentiary issue. In light of Solon's

change in status, the June 2013 Midanek Letter cannot qualify as an admission, and it

will be excluded and not relied upon by the Court on this motion.

### 8.    *July 2013 Richcourt Funds Letter*

Understandably, Composite does not challenge the admissibility of the July 2013

Richcourt Funds Letter.[133]  The Court determines that it is not hearsay, since it is a party

admission,[134] and it is admissible here.

### 9.    *December 2013 Katz Affidavit*

Mr. Katz was an accounting professional retained by the Elite estate back when it

was a debtor-in-possession. The Katz Affidavit was submitted by Elite in opposition to

the ultimately successful motion to appoint a chapter 11 trustee. In contrast to the

---

[133]        Composite SJ Br. at 1.

[134]        *See* Fed. R. Evid. 801(d)(2)(A) (excluding from hearsay a statement made by the party against
whom the statement is offered).

circumstances surrounding most of the other documents, it does not appear that Mr.

Katz's services were enlisted as part of a team effort to benefit Composite.   Rather, it

appears that in fact as well as in law, he was serving only Elite—the entity for whom he

had been retained to serve.

Under these circumstances, the Court cannot find that Mr. Katz was an agent for

Composite, or that what he said was an admission of Composite.  And as a professional

brought in after the events at issue here, Mr. Katz lacked firsthand knowledge of the facts

relating to Elite's redemption request.

There being no other potential hearsay exception shown to be applicable (as a

predicate was not laid for admitting the underlying financial information as a business

record, for example), the Katz Affidavit must be excluded, and it will not be considered

on this motion.

### 10.    January 2014 Martin Letter

The Court need not, and does not, determine whether Mr. Martin's remarks

should be admitted as admissions bearing on summary judgment.  It will not be relying

on them in its summary judgment determination anyway, as they are insufficiently

relevant to that inquiry.  The Court can, and will, consider the January 2014 Martin Letter

as containing admissions relevant to the asset freezing injunction request, considered

separately below.

### 11.    March 2014 Martin Statements

Mr. Martin's remarks—and especially the motion that he had filed occasioning

those remarks—support, and ultimately justify, the admissibility of the March 2014

Martin Statements.

As noted above, Mr. Martin's remarks in court on March 19, 2014 were made while prosecuting a motion filed, as relevant here, on behalf of Mr. Fletcher, Mr. Ladner, Mr. Saunders, Mr. Turner, and the Management Company. The motion filed on their behalf (which thus was an admission of each of them) stated that none of the Soundview Debtors had any "direct employees," and that services were provided to them by "associated management companies and unassociated service providers." The motion stated that "Soundview Management [*i.e.*, the Management Company] *directed the efforts of the Debtors' counsel* and financial advisors on all matters pertaining to the estate's investments, which stated differently, means estate assets."[135]   And the Management Company was likewise the manager for Composite. The same company— run by the same Mr. Fletcher—was directing both. Under these circumstances, the Court is unwilling to find, as Composite argues, that Mr. Martin was speaking only for Elite, and not Composite. He was taking directions from the same Mr. Fletcher, who until displaced by the Trustee on the Soundview Debtors' side, was managing both.

Wholly apart from that, the Court is mindful of what Mr. Martin was trying to accomplish by the motion and the remarks he made in court supporting it. He was appearing on behalf of Mr. Fletcher, Mr. Ladner, Mr. Turner, and Fletcher Asset Management, among others*, to get them paid.* He was acting for *their* benefit—not, at this time, for Elite, Premium or Star. They cannot now be heard to say that Mr. Martin was not really speaking for them.[136]

---

[135]   *See* page 23 *supra*.

[136]   *See United States v. McKeon*, 738 F.2d 26, 30 (2d Cir. 1984) (it is "well established" that "[s]tatements made by an attorney concerning a matter within his employment may be admissible against the party retaining the attorney") (internal citation omitted).

The March 2014 Martin Statements are admissions, and thus not hearsay. They are admissible and will be considered on this motion.

* * *

For the reasons stated, the hearsay objections to the June 2013 Midanek Letter and the Katz Affidavit on summary judgment are sustained. The Court will not consider the January 2014 Martin Letter for summary judgment purposes, as the Court regards that letter to be insufficiently relevant to summary judgment. All other evidentiary objections are overruled.

B.     *Merits of Summary Judgment Motion*

Having considered the admissible evidence put forward by the Trustee on her summary judgment motion, and Mr. Fletcher's affidavit in opposition, the Court determines that it does not yet have enough information to fix the exact amount due from Composite to Elite. But the Trustee has satisfactorily shown everything else. Mr. Fletcher's responsive affidavit, discussed below, is notable for its evasiveness and indirection, and its efforts to disavow what Composite told CIMA when CIMA was investigating, among other things, issues of the very type present here—the extent to which Composite and other funds under Mr. Fletcher's control were failing to honor redemption obligations to their customers. More fundamentally, Mr. Fletcher's affidavit is notable for its failure to put forth any evidence to contradict, by actual evidence, the many earlier admissions on which the Trustee relies, addressed above and below.

Mr. Fletcher's responses fail to create issues of fact. Partial summary judgment will be granted on all but the amount due, and, incident to that, the Court will issue the particular determinations set forth below.

-45-

### 1.    *Summary Judgment Standards*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[137]  The moving party bears the initial burden of showing that the undisputed facts entitle it to judgment as a matter of law.[138]  Then, if the movant carries this initial burden, the non-moving party must set forth specific facts to show that there are triable issues of fact, and cannot rely on pleadings containing mere allegations or denials.[139]

In deciding a summary judgment motion, it is well settled that the Court should not weigh the evidence or determine the truth of any matter, and must resolve all ambiguities and draw all reasonable inferences against the moving party.[140]  A fact is material if it "might affect the outcome of the suit under the governing law."[141]  An issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[142]

---

[137]    Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

[138]    *See Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir. 1995); *Ferrostaal, Inc. v. Union Pacific R.R. Co.*, 109 F. Supp. 2d 146, 148 (S.D.N.Y. 2000) ("The initial burden rests on the moving party to demonstrate the absence of a genuine issue of material fact...."); *Pali Holdings*, 488 B.R. at 845.

[139]    *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 1355-56 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553 (1986); *Jeffreys v. City of New York*, 427 F.3d 549, 554 (2d Cir. 2005); *Kittay v. Peter D. Leibowits Co., Inc. (In re Duke & Benedict, Inc.)*, 265 B.R. 524, 529 (Bankr. S.D.N.Y. 2001) ("[T]he nonmoving party must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials.").

[140]    *See Matsushita*, 475 U.S. at 587, 106 S. Ct. at 1356 (summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party"); *Virgin Atlantic Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 262 (2d Cir. 2001); *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001) ("We ... constru[e] the evidence in the light most favorable to the non-moving party.").

[141]    *See Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

[142]    *Id.*

2.    *The Trustee's Showing*

For reasons discussed above, the great bulk of Composite's evidentiary objections

to the Trustee's showing have been overruled.  By Composite's own admissions—

including some that Mr. Fletcher himself endorsed[143]—the Trustee put forward

admissible evidence establishing:

(1)    Composite's only outside investor during the relevant period has

been Elite;[144]

(2)    Elite requested a full redemption,[145] by no later than May 2012;[146]

and even more clearly by July 2013;[147]

(3)    The trade date for Elite's redemption was September 30, 2011;[148]

(4)    Composite's redemptions have never been suspended;[149]

(5)    Composite's redemptions have never been gated;[150]

(6)    There has been no reason for Composite to gate redemptions, since

Composite has only one investor;[151]

---

[143]    *See* June 2013 Fletcher E-Mail (telling Mr. Turner to incorporate the matter stated by Michael Siedlecki into what became the July 2013 Richcourt Funds Letter, which included Mr. Siedlecki's observations, among others, that only Elite, Premium and Star had gated redemptions, and thus that Composite had not).

[144]    *See* May 2012 Loeb E-Mail; May 2012 de Saram Letter; May 2013 Midanek Letter.

[145]    *See* May 2012 Loeb E-Mail; May 2012 de Saram Letter; May 2013 Midanek Letter; July 2013 Richcourt Funds Letter.

[146]    *See* May 2012 Loeb E-Mail; May 2012 de Saram Letter.

[147]    *See* May 2013 Midanek 2013 Letter (confirming that Elite's redemption request was pending as of May 2013); July 2013 Turner E-Mail (same, as of July 2013); July 2013 Richcourt Funds Letter (same, as of July 2013).

[148]    *See* May 2013 Midanek Letter.

[149]    *See* 2012 Loeb E-Mail; May 2012 de Saram Letter; May 2013 Midanek Letter.

[150]    *See* 2012 Loeb E-Mail; May 2012 de Saram Letter; May 2013 Siedlecki E-Mail; July 2013 Turner E-Mail; July 2013 Richcourt Funds Letter

[151]    May 2012 Loeb E-Mail.

(7)    Elite's redemption request was outstanding as early as May 2012,[152] and remains outstanding today;

(8)    The value of Elite's redemption request, as estimated by Composite, ranges from $5 million[153] to $3.8 million,[154] and thus is no less than $3.8 million;[155] and

(9)    The estimated value of Composite's portfolio as of July 2013 was $5.155 million.[156]

### 3.    Composite's Response—The Redemption Request

Apart from its contentions that most of the Trustee's showing was inadmissible (which, except with respect to the June 2013 Midanek E-Mail and Katz Affidavit, the Court now has rejected), that the Trustee's evidence is "ambiguous," and that the above facts are still not enough, Composite relies solely on an affidavit by Mr. Fletcher in opposition to the Trustee' summary judgment motion.  That affidavit is insufficient to rebut the Trustee's showing, or even to create issues of material fact.

Mr. Fletcher's affidavit consists of 39 paragraphs.  In none of them does Mr. Fletcher ever say that the redemption request was not made.  Nor does he say that the redemption request—directly acknowledged four times,[157] including by the Richcourt

---

[152]    May 2012 de Saram Letter.  It was also said to be outstanding as of May 2013, *see* May 2013 Midanek Letter; June 2013, *see* June 2013 Siedlecki E-Mail; and July 2013, *see* July 2013 Turner E-Mail and July 2014 Richcourt Letter.

[153]    July 2013 Turner E-Mail; July 2013 Richcourt Letter.

[154]    March 2014 Martin Statements.

[155]    Elite, as Composite's only shareholder, was entitled to the entirety of Composite's net assets.  But declines in the value of those assets could (and likely would) result in the differences between the $5 million and $3.8 million figures.  This could be confirmed or disproved in the trial to follow when Elite's exact entitlement will be determined.

[156]    July 2013 Turner E-Mail.

[157]    *See* page 47 & n.145 *supra*.

-48-

team whom he personally directed,[158] and whose submission to CIMA he personally edited[159]—does not exist.

Rather, Mr. Fletcher says a variety of other things—presumably to imply, though without saying, that the admitted redemption request was not made—which fall well short of refuting Composite's earlier admissions. Thus, Mr. Fletcher says that the Trustee (who got what documents she could from Mr. Fletcher, companies Mr. Fletcher controlled, and their counsel) "does not present the actual redemption request."[160] He says "[t]he Trustee does not provide *direct* proof that any of this happened."[161] But "direct proof" (assuming that means producing the document embodying the request itself) is not the point. The Trustee has adduced eight separate admissions that it did, indeed, happen.[162]

---

[158] *See* e-mails from Mr. Fletcher of June 26, 2013 (2:53 p.m.), June 27, 2013 (2:43 and 2:59 p.m.), June 28, 2013 (5:27 p.m.), June 30, 2013 (9:28 p.m.), July 9, 2013 (1:53 p.m., 3:31 p.m. and 6:50 p.m.), all parts of Dailey Decl. Exh. J. For example, as appearing in those e-mails, Mr. Fletcher wrote on June 26, "Stewart, Please draft a letter, on behalf of the Cayman Richcourt funds to the Cayman Islands Monetary Authority, that incorporate the information from Michael's earlier email below and the following suggestions which address the derogatory letter that Deborah sent to CIMA the after [*sic.*] she was removed as a director. After the four of us review it and finalize edits, Floyd can share it with Cayman counsel." On the next day, Mr. Fletcher asked "When might a draft be ready?" and 16 minutes later, "Please try to provide a first draft today."

Finally, in the July 9, 2013 (3:31 p.m.) e-mail, Mr. Fletcher wrote "Thank you very much. Floyd, I think the letter is ready."

[159] *See id.* For example, on July 10, 2013 (9:18 a.m.), Mr. Fletcher directed his team: "We're sending it signed by the funds rather than directors." Thus the signatories on the July 2013 Richcourt Funds Letter were not Mr. Fletcher or any of the others on the team he directed, but rather "Soundview Composite Ltd." and other Richcourt funds.

[160] Fletcher Aff. ¶ 2.

[161] *Id.* ¶ 3 (emphasis added).

[162] Additionally, Mr. Fletcher submits two more—in Ex. 6 to his affidavit, reflecting "Trade Instructions" showing a trade for Composite, dated June 5, 2011, for the "Full Amount" of a redemption with a "Dealing Date" of 9/30/2011, for a "Redemption," with Notes stating "Full Position Redemption. Approx $5.66mm," followed, two pages later, by "Projected Payout Schedules" showing a payout for Composite of $5.663 million in Oct. 2011.

Mr. Fletcher goes on to say that "I have searched both Composite's files and [the Management Company's] files and I have not found the redemption request…."[163]  But he does not say that he searched the files of HSBC, Composite's administrator at the time—to whom the request would have been sent.  And merely saying that he had not found the Redemption Request (apart from his failure to address the fact that *he failed to look in the most likely place where it would be*) says nothing about whether the previously acknowledged redemption request ever existed.

In fact, Mr. Fletcher acknowledges this very problem.  Recognizing that he and his colleagues expressly acknowledged the Redemption Request in the July 2013 Richcourt Funds Letter, he seeks relief from the admission by saying that it "was prepared at a time of great turmoil."[164]  He notes that after resigning as fund administrator in July 2011, HSBC held the documents pertaining to the funds that the Management Company managed (including Composite),[165] and that without those documents, it would be "impossible to ascertain the exact status of the transactions for the [Management Company]-managed funds"[166]—which included Elite and Composite.  Yet as noted, Mr. Fletcher does not say that he searched HSBC's files.  And he does not say that documents Composite received from HSBC were complete.  Thus Mr. Fletcher's assertions as to what he could not find—especially given the places that he searched and did not search—cannot rebut what people with actual knowledge of the facts said at the time.

---

[163]    *Id.* ¶ 10.  He also says that Elite "presumably" kept a copy of the request, and "the Trustee has all of Elite's files."

[164]    Fletcher Aff. ¶ 22.

[165]    *Id.*

[166]    *Id.*

Nor do Mr. Fletcher's other responses give the Court anything substantive.  He

says, once again (this time with respect to Elite's other two directors, Messrs. Turner and

Kiely), that he has "seen no evidence" that either of the other directors "knew of or

ratified the alleged request in 2011," but ignores the fact that Mr. Turner, the original

drafter of the July 2013 Richcourt Funds Letter, knew of the Elite Redemption Request

when the letter Mr. Turner drafted in June and July 2013 *expressly made mention of it*

(and Mr. Fletcher obviously knew of it then as well), and Mr. Fletcher is notably silent

about ever having talked to anyone else at Elite about it.

In fact, Mr. Fletcher says cryptically, that "I have, however, found a proposal for

a similar request that was never approved."[167]  And he admits that on June 6, 2011, Dean

Rubino, a Richcourt employee, sent "a group of proposed redemptions" to his fellow

director Mr. Kiely, and that "[t]he group included a redemption of Elite's remaining

position in Composite with a 'dealing date' of September 30, 2011."[168]  Mr. Fletcher

claims that the request was not approved by anyone with authority to honor it.[169]  But his

denial does not negate the fact that the request was made.

Then, further to his "I have found no evidence" defenses, Mr. Fletcher says that "I

have found no evidence that a redemption request from Elite to Composite ever went

through a full formal review and was approved by authorized executives."[170]  But Mr.

Fletcher never details the review that was required, what that review might determine, or

why it would be an impediment to honoring the redemption.  It will be recalled that the

---

[167]    *Id.* ¶ 15.

[168]    *Id.* ¶ 16.

[169]    *Id.*

[170]    *Id.* ¶ 10.

Composite Articles merely prescribed that any redemption request "be in writing"; that it specify the number and class of shares to be redeemed; and that it be "signed by the holder thereof."[171]  No "full formal review" and approval was required.

Then Mr. Fletcher explains that the July 2013 Richcourt Funds Letter (which he acknowledges he "helped write"[172]), rather than giving "an assurance of payment" of a redemption request, was no more than a statement of an intent to "appropriately satisfy the pending redemptions in accordance with the governing documents."[173]  This, he explains, was not really a statement of an intent to honor the redemption (despite its natural interpretation), but rather of an intent to parse the documents for the ability to decline the request.  Thus he says:

> Though a redemption request to Composite may have been made, the request had to be reviewed and would have to abide a vetting in accordance with the governing documents, including Composite's Articles of Association (which requires the redemption request to be signed by an authorized representative), and the Private Placement Memorandum (which requires delivery to the fund administrator).  There is no statement in the letter that the purported request met the requirements of those documents, was valid, and was due and owing."[174]

But these qualifications grossly overstate the requirements of the approval process—which, as just noted, required nothing more for a redemption than a writing, a statement of the amount to be redeemed, and a signature.  If there were an unstated requirement for more, what was told to CIMA was a half-truth at best.  But there was no requirement for

---

[171]     *See* page 5 *supra.*

[172]     Fletcher Aff. ¶ 21.

[173]     *Id.*

[174]     *Id.*

more.  Mr. Fletcher has failed to raise a valid defense to the existence of the repeatedly

acknowledged redemption demand, or even to create an issue of fact with respect to it.

Finally, with respect to a redemption request having been made, Mr. Fletcher says

"Well, if I wanted the redemption done and controlled all the participants, then the

redemption should have been done when I gave the order, but there never was a

redemption."[175]  But apart from its reliance on inference and not facts, this says nothing

upon which the Court can base a finding other than that there never was a redemption,

and that after the request was made, Mr. Fletcher did *not* want the redemption made.

Thus, nothing Mr. Fletcher said is sufficient to contradict the admissions, which

squarely acknowledged the redemption requests, and stated that the redemption requests

were still pending.

### 4.   *Composite's Response—Gating*

Composite likewise relies on Mr. Fletcher's affidavit with respect to its Gating

defense.[176]  Mr. Fletcher contends, in substance, that Composite's documents had always

given it the right to gate redemption requests[177] (unless that right was waived by

Composite's directors, which he says had not happened),[178] and implies (without quite

saying) that the fact that Composite had never gated redemptions in the past didn't mean

that it couldn't do so in the future.  Mr. Fletcher further says Mr. de Saram was wrong

when he said that Composite had never been gated,[179] and disputes Ms. Loeb's statement

that there would be no reason to gate redemptions when Composite had only one

---

[175]     Fletcher Aff. ¶ 11.

[176]     *See* Fletcher Aff. ¶¶ 30-34.

[177]     *See id.* ¶ 30-31

[178]     *Id.* ¶ 31.

[179]     *Id.*

investor—as this, Mr. Fletcher asserts in his affidavit, "would give Composite additional time to maximize the value of its holdings and earn a profit while the redemption paid gradually [*sic.*]."[180]   He also contends that there was a reason that an asserted Composite right to gate redemptions was not mentioned in the July 2013 Richcourt Funds Letter responding to CIMA—because there had been no redemptions *since May 2012*, and that this was the only thing that CIMA asked Composite about.

The Court agrees with Mr. Fletcher that Composite's documents gave it the right to gate redemptions, and that (putting aside what would have been fully honest responses to CIMA), there would be a distinction between Composite's having the right to gate redemptions and its actually exercising that right—a distinction that Composite, if it really wanted to make that distinction, blurred in its several communications internally, and more importantly to CIMA.   But the Court disagrees with Composite in every other respect.   And it finds Mr. Fletcher's gating contentions to be insufficient to provide a defense to the Trustee's claims now.

The Court rejects Composite's gating defense for three separate reasons.

First, assuming that Composite had the right under its documents to gate redemptions, the record is devoid of any indication that Composite did so.   Mr. Fletcher proffers no board minutes or other contemporaneous indications of any action on his part, or his associates', to make or communicate a gating determination, even after this controversy blew up.[181]   And even in his affidavit on this motion, Mr. Fletcher does not say when and how any determinations to exercise the right to gate were ever made.

---

[180]      *Id.* ¶ 32.

[181]      Ms. Loeb stated in the May 2012 Loeb E-Mail that redemptions from Composite had never been gated, and that was passed on to CIMA by Mr. de Saram in the May 2012 de Saram Letter the next day.   Those statements were accurate; Composite had never invoked gating to deny an

Second, Ms. Loeb was right that gating would serve no purpose when Composite had only a single investor. It now is sophistry for Mr. Fletcher to contend that he could withhold the full redemption requested by his only investor to try to make a bigger profit. A bigger profit for whom? The profit (or loss[182]) *would go to Composite's single investor Elite in any event*—and Composite's single investor had stated that it wanted its money back then. Mr. Fletcher could not appropriately withhold the redemption for any other kind of gain or profit, *e.g.*, to achieve continued management fees for the Management Company or himself.

Third, there is an additional problem with Composite's gating excuse here. Assuming that Composite had the right to gate (and putting aside Fletcher's lack of candor to CIMA if he intended to invoke a gating right without saying so), that right only gave Composite the authority to defer, not refuse, redemptions. Composite still had to pay out 10% of the NAV per quarter—*i.e.,* 40% per year. With the redemption request having been made no later than May 2012, at least 12 quarters now have passed, obligating Composite to have returned to Elite, by June 2015, the entirety of Elite's redemption request. Even assuming the right to gate when the Redemption Request came in, the time to pay Elite in full has now come and gone.

The gating right is a red herring. The Court rejects it as a defense.

---

investor the right to the prompt return of its NAV. But if, as Mr. Fletcher now says, Composite *reserved the right* to gate redemptions without having *yet exercised* that right (and gating justified Composite's failure, prior to May 2012, to honor Elite's 2011 redemption request to Composite), Composite told CIMA a half-truth—not because Mr. de Saram was less than candid, but because (assuming Mr. Fletcher's gating contentions to be true) Composite had not told Mr. de Saram of the asserted right that purportedly had been reserved. In any event, gating was not the reason for Composite's failure to honor Elite's redemption request in the period from June 2011 to May 2012, if, in fact, it ever was.

182   As of March 31, 2011, Composite records valued Elite's remaining shares at $6.358 million. By the time of Composite's various admissions, July 2013, the value had dropped to $5 million. By the time of the March 2014 Statements, the value dropped further to $3.8 million.

5.    *Composite's Response—Redemption Amount*

Composite further disputes the Trustee's showing of the amount of Elite's claim. Composite contends that the May 2013 Midanek Latter, the June 2013 Midanek Letter, and the Katz Affidavit are all inadmissible in evidence[183] (thus assertedly resulting in a failure of proof on the amount of Elite's entitlement), and that Elite's entitlement is only to the Composite NAV at the time of redemption—which, Composite says, could not be determined, because Composite had ceased to be audited.  The Court agrees that only the approximate amount of Composite's claim is established on the existing record, but rejects all of Composite's remaining contentions.

As an evidentiary matter, the Court has excluded the June 2013 Midanek Letter and the Katz Affidavit, but the May 2013 Midanek letter has been admitted, and is part of the record.  Moreover, Composite fails to address the July 2013 Turner E-Mail (noting not just the redemption request, but that it was in the estimated amount of $5 million); the July 2013 Richcourt Funds Letter (stating, once again, that the one pending redemption had an estimated value of $5 million); and the March 2014 Martin Statements (making reference to the redemption request, but quantifying it as only $3.8 million).  They all are effectively saying the same thing, merely pegging a then-existing redemption request to the communicator's belief as to the value of Composite's net assets at that time.

The Court can and does quantify the Trustee's claim as "at least" $3.8 million, but is not otherwise in a position to now fix it in amount.  But the Court rejects Composite's implication that the amount due to Elite can never be fixed.  Further proceedings can clarify whether Elite's redemption entitlement is to $5 million, $3.8 million, or something

---

[183]    *See* Fletcher Aff. ¶¶ 25-26.

in between.  And an audit (which was never identified as a reason for failing to honor

Elite's redemption request) is not essential to determining the amount that must be

returned to Elite.  Elite's entitlement can be ascertained by all of the traditional means by

which plaintiffs prove up their damages and similar entitlements when their

counterparties have failed to honor contractual obligations, or by an accounting.

The parties have not sufficiently briefed the issues surrounding the amount of

other creditors' claims; whether Elite's claim would be junior to, or *pari passu* with,

those other creditors' claims; and whether claims against Composite by insiders (such as

the Management Company, Fletcher, Saunders and Ladner) would be senior to (or even

*pari passu* with) Elite's entitlement.[184]  These matters typify why the Court, as convinced

as it is that Composite's defenses to honoring its redemption argument are frivolous,

cannot enter a full judgment--or, more precisely, makes a full Report and

Recommendation--now.

C.      *Judicial and Equitable Estoppel*

Apart from the merits of the Trustee's request for summary judgment, the Trustee

makes a further argument as well—that summary judgment is warranted under the

doctrines of equitable and judicial estoppel, based on prior positions taken in the

underlying chapter 11 case—first, in the January 2014 Martin Letter; second, in

statements by Mr. Martin in open court later on that same day, January 21; and third,

when trying to recover fees for Mr. Fletcher and other Soundview Debtors' directors and

the Management Company in March.  The Court cannot, and does not, rely on the first

two communications; they are inadmissible hearsay.  But the third communication, while

---

[184]        Depending on the answers to these questions, determining where, in the spectrum between
$5 million and $3.8 million, Elite's entitlement falls may not matter, if even the lowest amount
exceeds the assets Composite would have left.  At this point, however, it is too soon to say.

it does not support equitable estoppel, is admissible, providing a potential second basis

for the Court's award of partial summary judgment here.

Ultimately, however, the Court determines that judicial estoppel is applicable only

to the Trustee's request for the continued asset freeze, and not to her request for summary

judgment.

     *1.    Evidentiary Matters*

Preliminarily, as a factual matter, the record on which the estoppel claims rest

cannot include statements in the first two communications.  In the January 2014 Martin

Letter, Mr. Martin acknowledged that Elite and other Soundview Debtors had "*presented*

*evidence* at trial that Soundview Composite owned Soundview Elite that amount,"[185] but

his statement fell short of saying that amount was actually owed.  And at the time, he was

speaking for Elite alone, and Elite's interests at the time were adverse to Composite's.[186]

Later in court the same day, Mr. Martin's remarks were made in the same context

as his letter.  And though this time Mr. Martin expressly recognized the existence of

Composite's debt, the interests of the Soundview Debtors and others (*e.g.,* the

Management Company and Mr. Fletcher), while aligned in opposing the asset freezing

TRO, were still adverse with respect to the issues here on summary judgment.  Thus the

Court can consider Mr. Martin's statements then to be an admission only on the issue as

to which their interests were aligned—*i.e.*, the asset freeze, discussed below.

Matters stated in the third of the communications on which the Trustee relies—the

March 2014 Martin Statements—are, however, admissible for purposes of judicial

---

[185]    January 2014 Martin Letter at 1 (emphasis added).

[186]    By contrast, in March 2014, Mr. Martin was speaking for the Management Company, Fletcher, Ladner, Saunders and Turner, directing and controlling both entities, which is why the Court is unwilling to hold that he was speaking for Elite alone, and regards the March 2014 Warren Statements as an admission.

estoppel, just as they were on summary judgment itself.  At this time, as previously

noted,[187] when seeking approval to get among others, Messrs. Fletcher, Ladner and

Turner paid, Mr. Martin was acting for those individuals' benefit—with Mr. Fletcher

present telephonically, and Messrs. Ladner and Turner present in court.  They were

benefitting from what Mr. Martin told the Court.  But if they were benefitting from

anything false that Mr. Martin might have said, they could have, and should have, said so.

The Court finds unpersuasive their arguments that they could properly remain silent if a

false statement was being made to the Court.  Just as the March 2014 Martin Statements

were ordinary admissions, the silence of Messrs. Fletcher, Ladner and Turner constituted

adoptive ones.

### 2.    *Equitable Estoppel*

The Trustee then argues that equitable estoppel "principles" bar Composite from

"walking away from its obligations."[188]  The Trustee goes on to say that the Fletcher

team "operated on and controlled both sides of the redemption request"[189]—and "should

not be heard to raise objections about the mechanics of how the redemption request was

placed and processed, the state of its own records, or its own lack of valuation data,"[190] or

to renounce admissions made by people working on the Fletcher team's behalf.[191]

The Court understands the Trustee's frustration.  But it is compelled to agree with

points Composite makes in opposition to the Trustee's equitable estoppel argument.

With the inability to make credibility determinations on a summary judgment motion, the

---

[187]     *See* page 44 *supra*.

[188]     Trustee Opening Br. at 25; see also *id.* at 26.

[189]     *Id.* at 26.

[190]     *Id.*

[191]     *See id.*

Court cannot rely on this yet.  And the Court cannot see the requisite reliance by Elite,

and resulting injury, resulting from statements made by Mr. Fletcher and those acting on

Mr. Fletcher's behalf.

What the Trustee is really saying, in substance, is that Mr. Fletcher's excuses

now, after controlling both sides of the redemption transaction, are highly offensive.

That is true, but the Trustee's showing falls short of an equitable estoppel.[192]

### 3.   *Judicial Estoppel*

Judicial estoppel presents different issues.  As explained by the Supreme Court in

*New Hampshire v. Maine*,[193] and by the Second Circuit in *Adelphia Recovery Trust v.*

*Goldman Sachs & Co.*,[194] the exact criteria for invoking judicial estoppel varies based on

specific factual contexts.  But "courts have uniformly recognized that its purpose is to

protect the integrity of the judicial process by prohibiting parties from deliberately

changing positions according to the exigencies of the moment."[195]  Courts invoke judicial

estoppel when litigants "play 'fast and loose with the courts' by taking inconsistent

positions in related proceedings."[196]  In deciding whether judicial estoppel is warranted,

courts in this circuit consider whether:

(i) the party's later position is clearly inconsistent with its earlier position,

(ii) the party succeeded in persuading a court to accept the party's earlier

position, so that judicial acceptance of the inconsistent position in a later

---

[192]   The Trustee also mentions, in passing, promissory estoppel.  That doctrine is inapplicable here, as
Elite's claim is premised on an actually existing contract, well supported by consideration.

[193]   532 U.S. 742, 121 S.Ct. 1808 (2001) ("*New Hampshire*").

[194]   748 F.3d 110, 116 (2d Cir. 2014) ("*Adelphia-Goldman Sachs*").

[195]   *New Hampshire,* 532 U.S. at 749-51; *Adelphia-Goldman Sachs,* 748 F.3d at 116.

[196]   *Sperling v. U.S.,* 692 F.2d 223, 227 (2d Cir. 1997) (Van Graafeiland, J., concurring), *superseded
by statute on other grounds, as recognized by Triestman v. United* States, 124 F.3d 361, 368-69
(2d Cir. 1997).

proceeding would create the perception that either the first or the second court was misled, and

> (iii) the party seeking to assert an inconsistent position would derive an unfair advantage, or impose an unfair detriment on the opposing party, if not estopped.[197]

Here, the position taken by Mr. Fletcher is plainly inconsistent with the statements made by Mr. Martin—and by Mr. Fletcher himself, in adoptive admissions when he remained silent if, as Mr. Fletcher now contends, Mr. Martin was wrong. And the reversal in position would give rise to both an unfair advantage and impose an unfair detriment on the opposing party—*i.e.*, the Trustee. But insofar as judicial estoppel is argued to support summary judgment itself, the second element is lacking. In March 2014, the Court assumed that the $3.8 million could be recovered by Elite from Composite (and thus that the Soundview Debtors' estates would have the funds to pay the requested fees), but made no findings on the existence of the redemption debt at that time.[198] Rather, the Court rejected the fee requests at that time for a host of other reasons—one of which was "claims going in the other direction [*i.e.*, by Elite and other Soundview Debtors against Mr. Fletcher and others] that might have to be addressed."[199]

As judicial reliance on the March 2014 Martin Statements is lacking, judicial estoppel based on them on this summary judgment motion is not warranted.

---

[197]   *Adelphia-Goldman Sachs,* 748 F.3d at 116 (citing *New Hampshire*, 532 U.S. at 750-51).

[198]   *See* Tr. of Hrg. of 3/19/2014 at 31-32.

[199]   *Id.* at 32.

III.

Preliminary Injunction Freezing Composite's Assets

Though the Court can grant the Trustee's summary judgment motion only in part at this time, it can, and does, issue the requested preliminary injunction freezing the disposition of Composite's assets pending the completion of this case—which effectively means no more than determining the amount of Elite's monetary entitlement, and the entry of a final judgment by the district court embodying Composite's duty to pay it.  The Court does so under each of Fed. R. Civ. P. 65(a) and Bankruptcy Code section 105(a), each of which provides separate authority for such measures.

A.    *Traditional Civil Rule 65(a) Doctrine*

Civil Rule 65(a), made applicable to adversary proceedings by virtue of Bankruptcy Rule 7065, provides that a court may issue a preliminary injunction after notice to the party against whom the injunction will be enforced.  The issuance of a preliminary injunction is an equitable remedy and within the discretion of the court.[200] The purpose is "to maintain the status quo pending the trial and determination of the action."[201]  The Court can and does grant a preliminary injunction freezing the disposition of Composite's assets—until the Trustee's monetary entitlement is computed, and the district court issues a final judgment—under traditional preliminary injunction standards, applicable in nonbankruptcy as well as bankruptcy-related matters.

---

[200]    *See*, *e.g.*, *Collier* ¶ 7065.02.

[201]    *Id.*; *see also Deckert v. Independence Shares Corp.*, 311 U.S. 282, 290, 61 S. Ct. 229, 234 (1940) (preliminary injunction approved as "a reasonable measure to preserve the status quo pending a final determination of the questions raised").

The standards for entry of a preliminary injunction in the Second Circuit, as set out in its well-known decision in *Jackson Dairy*[202] and its progeny,[203] are well established. As stated in *Jackson Dairy,* "the standard in the Second Circuit for injunctive relief clearly calls for a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."[204]  Those requirements are easily met here.

   *1.    Irreparable Injury*

   If this Court allows Composite to dispose of its remaining assets now—especially after the Court's summary judgment ruling, making Composite's ultimate loss a certainty—Elite will be irreparably injured.  Composite will be judgment-proof.  And while a disposition of assets after this ruling would be a slam-dunk intentional fraudulent conveyance, recovering Composite assets from diverse transferees may well be impossible—and plainly extraordinarily burdensome and expensive.

   Moreover, the risk of the dissipation of Composite's assets in the absence of an injunction barring such is very real.  As more fully explained in an opinion of Judge Woods of the district court[205] (in which Judge Woods, on standing grounds, dismissed Mr. Fletcher's appeal from a 2014 order of this Court which, among other things,

---

[202]    *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70 (2d Cir. 1979) ("***Jackson Dairy***").

[203]    *See, e.g., Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.,* 696 F.3d 206, 215 (2d Cir. 2012) (applying the *Jackson Dairy* standard, though not citing *Jackson Dairy* directly); *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.,* 660 F.3d 643, 648 (2d Cir. 2011) (citing *Jackson Dairy*); *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 35 (2d Cir. 2010) (same*); In re Motors Liquidation Co.,* 513 B.R. 467, 479 (Bankr. S.D.N.Y. 2014) (Gerber, J.) (same).

[204]    *See Jackson Dairy*, 596 F.2d at 72.

[205]    *See Fletcher v. Ball (In re Soundview Elite Ltd.),* 2015 U.S. Dist. LEXIS 60942, 2015 WL 2166023 (S.D.N.Y. May 8, 2015) (Woods, J.).

preserved the consensual restraints on Composite's assets[206]), Mr. Fletcher caused funds

to be withdrawn from Composite's Wilmington Trust account under an order authorizing

only a lesser amount of funds to be withdrawn, and for different purposes.  Mr. Fletcher

used frozen funds not just for the purposes of paying counsel for Composite to defend it

on these motions and in an investigation by the SEC (as this Court had authorized), but

for a host of impermissible purposes.  As Judge Woods stated, Mr. Fletcher and the

Richcourt funds:

> eventually provided a more detailed accounting of
> the disbursed funds, which confirmed that they had
> been used to pay various fees to Fletcher and his
> associates and attorney, to post bonds in a separate
> appeal in this Court, and to pay debts owed by other
> entities owned by Fletcher.[207]

Because Mr. Fletcher's prior actions were discovered quickly, it was possible,

incident to the contempt proceedings that followed, to secure the return of the

unauthorized withdrawals from Wilmington Trust, and the Trustee's injury turned out not

to be irreparable.  But she may not be as lucky the next time.  Mr. Fletcher's past

actions[208] underscore this Court's view that Mr. Fletcher cannot be allowed to do this

again.[209]  And if, as Composite contends, it is free to draw funds from the Wilmington

---

[206]   *Id.* at *13-14; 2015 WL 2166023 at *4-5.

[207]   *Id.* at *9-10 n.4, 2015 WL 2166023 at *4 n.4.

[208]   The Court considers these to be more than sufficient to explain its concerns.  It declines, on hearsay grounds, to accept the Trustee's suggestion that the Court additionally rely on the findings of the FILB Trustee.

[209]   In its response to the preliminary injunction motion, and the Trustee's understandable concern that Composite reneged on assurances to the Court that funds at Wilmington Trust would not be dissipated, Composite justifies its actions on the contention that "none of the 'assurances'…were made by anyone with authority to act on behalf of Soundview Composite." Composite PI Br. at 22 (ECF # 78).  The Court disagrees.

In providing an alternative to an immediate TRO, Mr. Martin was speaking to advance the interests not just of the Soundview Debtors, but also their affiliates—including, as Mr. Martin expressly stated, Composite.  Statements in the January 2014 Martin Letter and at the January 21,

Trust account because it was not bound by the earlier promises to keep the funds safe, the risk of injury to Elite unless this Court enters an order that unmistakably binds Composite to the protection of those funds is even clearer.

### 2. Likelihood of Success

Here the Trustee has shown much more than a likelihood of success. Except for ascertaining her monetary entitlement, and securing a district court judgment implementing her recovery, the Trustee has already fully won. The question now is not *whether* Elite will be entitled to the return of its investment (or what is left of it), but *when*.

---

2014 hearing are admissible, as admissions, with respect to the preliminary injunction prong of the Trustee's motions, even though not admissible with respect to the summary judgment prong, because of what Mr. Martin said and their obvious purpose. Those statements were expressly made for the benefit of the Management Company and Mr. Fletcher personally, who were then hoping to preserve their reputations. Mr. Fletcher and the Management Company then had a joint interest in avoiding the entry of a TRO and subsequent preliminary injunction that could destroy the remainder of their business. As Mr. Martin stated:

> The Soundview Debtors wish to avoid entry of any TRO under these circumstances out of concerns over continued damage they might suffer among creditors and investors as a result of the entry of a TRO. The repetition of loose allegations, found for example in this Emergency Motion, *e.g., see* paragraph 7, where it is stated that "The JOLs proved that the Fletcher Team is untrustworthy, committed fraud, and mismanaged the funds of the Debtors," if such allegations are immediately followed by the entry of a TRO, could be used as evidence against the Debtor *and its affiliates* in other jurisdictions to establish that this Court sanctioned *Soundview Composite* and these Debtors for some unspecified improper conduct.

January 2014 Martin Ltr. at 2 (emphasis added).

Composite further tries to minimize the danger to Elite in the absence of a preliminary injunction by saying that the Trustee does not allege that the purpose of taking money out of the Wilmington Trust account was to defraud creditors in collecting on their debts or to frustrate the enforcement of any future judgment that could be obtained by the Trustee. *See* Composite PI Br. at 22. Even if an intentional fraudulent conveyance was not the purpose of that transfer, that was its effect. And it gives the Court little solace in knowing that the prior actions were taken solely to achieve personal gain.

3.      *Serious Issues and Tipping of Equities*

An alternative basis for relief—serious issues going to the merits, coupled with a tipping of the equities in favor of the injunction—need not be considered to grant an asset-freezing preliminary injunction here, because of the Trustee's overwhelming showing on the merits.  But if it were, it would easily be satisfied.  The Trustee has shown much more than serious issues in her favor.  And her showing is equally strong on the tipping of the equities.  Elite will suffer grievously if Composite's funds are dissipated, especially since the residual ownership of the funds effectively already belongs to Elite.  And Composite would not be prejudiced in the least; Composite has no claim to the funds whatever.  Anything in the Wilmington Trust account belongs to either Elite or Composite's creditors.[210]

B.  *Section 105(a) Doctrine*

Additionally, where, as here, the plaintiff is a bankruptcy estate trying to recover its assets for funding a reorganization—even under a liquidating plan—there is an additional basis for injunctive relief preserving the property to be recovered.  Section 105 of the Bankruptcy Code provides bankruptcy courts with a broad range of equitable powers in proceedings within its jurisdiction, including the power to issue any order "necessary or appropriate to carry out the provisions of this title."  Among the actions that may be taken pursuant to this authority is an injunction freezing the assets of a defendant when the plaintiff is seeking equitable relief, such as the recovery of property

---

[210]     Normally the public interest is not a factor on preliminary injunction applications involving private disputes.  If it were, it would likewise strongly support issuance of injunctive relief as well.  There is a strong public interest in avoiding the dissipation of corporate assets that rightfully should go to creditors or other stakeholders.

or an accounting, both of which are requested here.[211]  Such relief may also be awarded

when it facilitates a reorganization plan.  Here the Trustee is unlikely to confirm a plan

calling for an operational reorganization, but a reorganization plan can also include an

orderly liquidation—the most likely scenario here.

The applicable law relating to the exercise of the section 105(a) injunction power

was restated in the *Calpine* decisions.[212]  As noted in *Calpine–District,* courts have

applied the "traditional preliminary injunction standard as modified to fit the bankruptcy

context."[213]  The *Calpine–District* court engaged in its analysis using the following

factors: (1) whether there is a likelihood of successful reorganization; (2) whether there is

an imminent irreparable harm to the estate in the absence of an injunction;[214] (3) whether

the balance of harms tips in favor of the moving party; and (4) whether the public interest

weighs in favor of an injunction.[215]

---

[211]   *See Adelphia Commc'ns Corp. v. Rigas (In re Adelphia Commc'ns Corp.)*, 2003 U.S. Dist. LEXIS 9349, at *12, 2003 WL 21297258, at *4 (S.D.N.Y. June 4, 2003) (Daniels, J.) ("***Adelphia-Rigas***") (bankruptcy court has authority to issue preliminary injunction when plaintiff seeks equitable remedy); *In re Keene Corp.*, 168 B.R. 285, 292 (Bankr. S.D.N.Y. 1994) ("[T]he court can enjoin activities that threaten the reorganization process or impair its jurisdiction.").

[212]   See *Calpine Corp. v. Nevada Power Co. (In re Calpine Corp.)*, 354 B.R. 45 (Bankr. S.D.N.Y. 2006) (Lifland, C.J.) ("***Calpine–Bankruptcy***"), aff'd 365 B.R. 401 (S.D.N.Y. 2007) (Scheindlin, J.) ("***Calpine–District***").

[213]   365 B.R. at 409 & n. 25, citing *Hawaii Structural Ironworkers Pension Trust Fund v. Calpine Corp., Inc. (In re Calpine Corp.)*, 2006 U.S. Dist. LEXIS 92499, 2006 WL 3755175, *4 (S.D.N.Y. Dec. 20, 2006) (Castel, J.).

[214]   However, it has been repeatedly held in this district that the usual grounds for injunctive relief, such as irreparable injury, need not be shown in a proceeding for an injunction under section 105(a).  *See LTV Steel Co. v. Board of Educ. (In re Chateaugay Corp.)*, 93 B.R. 26, 29 (S.D.N.Y. 1988) (Leval, J., then a District Judge); *Garrity v. Leffler (In re Neuman)*, 71 B.R. 567, 571 (S.D.N.Y. 1987) (Sweet, J.); *C & J Clark America, Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.)*, 92 B.R. 87, 92 (Bankr. S.D.N.Y.1988) (Brozman, C.J.); *Adelphia Communications Corp. v. The American Channel, LLC (In re Adelphia Communications Corp.)*, 345 B.R. 69, 85 (Bankr. S.D.N.Y. 2006).  In this case, irreparable injury to the Debtors' estate plainly is threatened anyway, as Elite has an undisputed interest in the funds held by Composite and there is a significant risk that Elite will be deprived of those funds (or a portion of them) in the absence of an injunction.

[215]   *Calpine-District* at 409.

Here too the circumstances strongly favor imposing a freezing injunction on Composite's assets.  The four factors favor the Trustee in every respect.

### 1.    Likelihood of Success

Although any reorganization plan the Trustee might propose would almost certainly be a liquidating plan, that does not foreclose this Court from finding the requisite likelihood of success.[216]  The Trustee has had the support of the Soundview Debtors' creditors in her efforts to manage this chapter 11 case, and, as especially relevant here, to recover assets to benefit the estate.  Any chapter 11 plan she might propose is unlikely to be controversial; after payments for expenses of reorganization, it is likely to conform to traditional bankruptcy obligations for *pari passu* treatment after satisfying any statutory priorities.  Courts do not demand certainty of a successful reorganization; they expect only reasonable prospects of such.[217]

### 2.    Irreparable Harm

The Court has already addressed irreparable harm in the discussion above.  Additionally, courts in the Second Circuit have determined that irreparable harm need not be shown as a requirement for issuance of a preliminary injunction in the bankruptcy

---

[216]   *Myerson & Kuhn v. Brunswick Assocs. Limited Partnership (In re Myerson & Kuhn)*, 121 B.R. 145, 154 (Bankr. S.D.N.Y. 1990) (Abram, J.) ("Section 105 grants bankruptcy courts ample power to enjoin actions excepted from the automatic stay which might interfere in the rehabilitative process, whether in a liquidation or in a reorganization case.") (citations omitted); *The Lautenberg Foundation v. Picard (In re Bernard L. Madoff Inv. Sec., LLC)*, 512 F. App'x 18, 20 (2d Cir. 2013) (granting preliminary injunction under section 105(a) in liquidation under SIPA); *McHale v. Alvarez (In re The 1031 Tax Grp., LLC)*, 397 B.R. 670, 686 (Bankr. S.D.N.Y. 2008) (Glenn, J.) (issuing preliminary injunction under section 105(a) to aid chapter 11 process even though chapter 11 trustee was pursuing chapter 11 liquidation plan)

[217]   *See Lyondell Chem. Co. v. Centerpoint Energy Servs Inc. (In re Lyondell Chemical Co.)*, 402 B.R. 571, 590 (2009) (Gerber, J.) ("**Lyondell Chemical**") ("While if there are reasons to conclude that the debtor(s) *could not* reorganize, that plainly should affect debtors' ability to invoke this factor, where debtors are proceeding "on track" and have met the challenges they have faced so far, that is sufficient.  The 'Likelihood of Successful Reorganization' factor has been satisfied here.") (emphasis in original, internal citation omitted).

context where the action to be enjoined is one that threatens the reorganization process or which would impair the court's jurisdiction with respect to the case before it.[218]  Thus, where the movant shows "that the action sought to be enjoined would embarrass, burden, delay or otherwise impede" the bankruptcy proceedings, or "if the stay is necessary to preserve or protect the debtor's estate," a bankruptcy court may issue injunctive relief.[219]

### 3. Balance of Harms

The Court has likewise already addressed the balance of harms in the discussion above.  For reasons there stated, Composite would not be harmed in the slightest by the preservation of the status quo, and Elite would be grievously injured if the investment it is about to recover is dissipated first.

### 4. Public Interest

Here too, the Public Interest factor favors the Trustee.  It is in the public interest that entities meet obligations to creditors and other stakeholders, and it is in the public interest that commercial obligors not dissipate their assets--or, when they have already done so, that they not do it again.

For these reasons too, the Court finds issuance of an asset-freezing injunction appropriate.

---

[218]    *See id.* ("Courts in the Second Circuit have recognized a limited exception to the irreparable harm requirement for issuance of a preliminary injunction in the bankruptcy context where the action to be enjoined is one that threatens the reorganization process or which would impair the court's jurisdiction with respect to the case before it.  Thus, where the movant shows 'that the action sought to be enjoined would embarrass, burden, delay or otherwise impede the reorganization proceedings or if the stay is necessary to preserve or protect the debtor's estate or reorganization prospects, the Bankruptcy Court may issue injunctive relief.'") (citing *Alert Holdings, Inc. v. Interstate Protective Servs., Inc. (In re Alert Holdings, Inc.,)*, 148 B.R. 194, 200 (Bankr. S.D.N.Y. 1992) (Brozman, C.J.)).

[219]    *Id.* at 591.

C.      *Grupo Mexicano Concerns*

Additionally, Composite contends that the Court cannot preserve the status quo by reason of limits imposed under the Supreme Court's decision in *Grupo Mexicano*.[220] Once more, the Court disagrees.

Composite's *Grupo Mexicano* defense is unsupported for two reasons.  First, it has been repeatedly held, in this District and elsewhere, and even at the Circuit Court of Appeals level,[221] that *Grupo Mexicano* does not constrain the powers to freeze the disposition of assets held by bankruptcy courts, whose equitable authority is not derived from generally applicable, pre-1789 authority.  As the Third Circuit, speaking through Judge Ambro, stated in *Owens Corning*:

> In short, the Court's opinion in *Grupo Mexicano* acknowledged that bankruptcy courts *do* have the authority to deal with the problems presented by that case.  One way to conceptualize this idea is to recognize that, had the company in *Grupo Mexicano* been in bankruptcy, the bankruptcy court would have had the authority to implement the remedy the district court lacked authority to order under general equity power outside the bankruptcy context.[222]

---

[220]     *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999) ("***Grupo Mexicano***").

[221]     *See In re Owens Corning*, 419 F.3d 195 (3rd Cir. 2005) ("***Owens Corning***") (quoted in main text); *Adelphia-Rigas*, 2003 U.S. Dist. LEXIS 9349 at *12, 2003 WL 21297258 at *4 ("*Grupo Mexicano*'s holding specifically applied to the district courts, and therefore is inapplicable in the bankruptcy court context."); *Shubert v. Premier Paper Prods., LLC*, (*In re American Tissue, Inc.*,), 2006 Bankr. LEXIS 3266, *10-11, 2006 WL 3498065, *3 (Bankr. D. Del. Dec. 4, 2006) (Gross, J.) ("***American Tissue***") ("The duty of the Court is to preserve the relative positions of the parties pending a trial on the merits....   In the bankruptcy setting, the Court should be especially sensitive to situations which could result in the dissipation of estate assets...and the Court's responsibility to prevent a wrongful taking of the bankrupt's assets provides it with a broader equitable power.") (citations, including a quotation from the portion of *Owens Corning* that distinguished *Grupo Mexicano*, omitted).

[222]     419 F.3d at 209 n.14 (emphasis in original).

Here, where the Trustee is attempting to marshal the Elite estate's assets for the benefit of its creditors, and to protect those creditors from efforts to dissipate property that may technically not yet be estate property but will be imminently, the Third Circuit's analysis in *Owens Corning* makes for a perfect fit.

Second, the Court here would have the authority to issue an asset freezing injunction against Composite even if *Grupo Mexicano* applied to bankruptcy courts. Courts have routinely held that when equitable claims have been asserted, the *Grupo Mexicano* rule barring issuance of a preliminary injunction freezing assets does not apply.[223] The fact that a plaintiff may *also* have valid claims for damages does not result in a forfeiture of the asset-freezing power.[224]

---

[223] *See, e.g. Rubin v. Pringle* (*In re Focus Media, Inc.*), 387 F.3d 1077, 1085 (9th Cir. 2004) ("**Focus Media**"), *cert. denied*, 544 U.S. 923 (2005) ("we hold that where, as here, a party in an adversary bankruptcy proceeding alleges fraudulent conveyance or other equitable causes of action, *Grupo Mexicano* does not bar the issuance of a preliminary injunction freezing assets"); *CSC Holdings, Inc. v. Redisi,* 309 F.3d 988, 996 (7th Cir. 2002) ("(*CSC Holdings*") (*Grupo Mexicano* "held that a district court may not issue an injunction freezing assets in an action for money damages where no equitable interest is claimed"; where equitable relief—for an accounting and resulting profits— was sought, in the alternative to claims for money damages, *Grupo Mexicano* was inapplicable, and asset-freezing injunction was proper); *United States ex rel. Rahman v. Oncology Assocs., P.C.,* 198 F.3d 489, 496-97 (4th Cir. 1999) ("**Rahman**") (observing, in Civil Rule 64 context, that "when the plaintiff creditor asserts a cognizable claim to specific assets of the defendant or seeks a remedy involving those assets, a court may in the interim invoke equity to preserve the *status quo* pending judgment where the legal remedy might prove inadequate and the preliminary relief furthers the court's ability to grant the final relief requested"); *Paradigm Biodevices, Inc. v. Centinel Spine, Inc.,* 2013 U.S. Dist. LEXIS 66858, at *5-7, 2013 WL 1915330, at *2-3 (S.D.N.Y. May 9, 2013) (Furman, J.) (same, citing, *inter alia, Rahman,* and noting that "as many courts have held, 'where plaintiffs seek both equitable and legal relief in relation to specific funds, a court retains its equitable power to freeze assets'"); *Tiffany (NJ) LLC v. Forbse,* 2012 U.S. Dist. LEXIS 72148, at *37 & n.12, 2012 WL 1918866, at *12 n.12 (S.D.N.Y. May 23, 2012) (Buchwald, J.) ("**Tiffany**") (claim for accounting for profits under the Lanham Act constituted discretionary equitable relief sufficient to give court the equitable power to issue a prejudgment restraint on the defendants' assets), *reconsideration with respect to other issues denied,* 2012 U.S. Dist. LEXIS 121361 (S.D.N.Y. Aug. 23, 2012), *aff'd in part, vacated in part on other grounds, Tiffany (NJ) LLC, Tiffany & Co. v. China Merchants Bank,* 589 F. App'x 550 (2d Cir. 2014); *United States v. Keyspan Corp.,* 763 F. Supp. 2d 633, 638-39 & n.3 (S.D.N.Y. 2011) (Pauley, J.) (claim for disgorgement of revenues earned under a swap allegedly executed for the purpose of restraining trade was equitable in nature, making *Grupo Mexicano* inapplicable). *See also Collier* ¶ 7065.01 (citing those and many other cases).

[224] *See, e.g., Adelphia-Rigas,* 2003 U.S. Dist. LEXIS 9349, at *12-14, 2003 WL 21297258 at *5 (where plaintiff estate sought not only money damages, but also equitable relief—imposition of a

Here, the Trustee has asked for an accounting, which is a classic basis for an asset-freezing order,[225] and which, as recognized by the First Department in *Kaminsky v. Kahn*,[226] "is a well-recognized form of equitable relief."[227] Here—especially given Composite's position with respect to all of the things that need to be done in order to compute Elite's entitlement—the Court considers an accounting to be a perfectly appropriate remedy.

Composite disputes that, however, arguing that under New York law, a plaintiff seeking an accounting must show "relations of a mutual and confidential nature."[228] From that, Composite contends (1) that this standard requires the existence of a *fiduciary relationship* between Elite and Composite, and (2) that "no [confidential or fiduciary] relationship exists between the sellers and buyers of corporate stock when dealing at arms' length."[229] But neither contention supports Composite's position here.

Composite's contention that a fiduciary relationship is essential to an accounting was expressly rejected by the Appellate Division in *Kaminsky*. There the First Department reversed a trial court ruling that had dismissed a claim for an accounting when

---

constructive trust and a demand for an accounting—*Grupo Mexicano* was inapplicable); *Motorola Credit Corp. v. Uzan,* 202 F. Supp. 2d 239, 250 (S.D.N.Y. 2002) (Rakoff, J.) , *rev'd with respect to other issues*, 322 F.3d 130 (2d Cir. 2003) (*Grupo Mexicano* did not bar plaintiffs' request for a preliminary injunction since, in addition to asserting money damages, plaintiffs there also asserted a demand for a constructive trust, and other equitable remedies); *Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.,* 2000 U.S. Dist. LEXIS 15664, at *3-5, 2000 WL 1610790, *1 (S.D.N.Y. Oct. 26, 2000) (Martin, J.) ("courts since *Grupo Mexicano* have found that where plaintiffs seek both equitable and legal relief in relation to specific funds, a court retains it[s] equitable power to freeze assets").

[225]   *See Focus Media,* 387 F.3d at 1085; *CSC Holdings*, 309 F.3d at 996; *Tiffany*, 2012 U.S. Dist. LEXIS 72148 at *37 & n.12, 2012 WL 1918866 at *12 n.12; *Adelphia-Rigas*, 2003 U.S. Dist. LEXIS 9349 at #12-14, 2003 WL 21297258 at *5.

[226]   23 A.D.2d 231, 259 N.Y.S.2d 716 (1st Dept. 1965) ("*Kaminsky*").

[227]   23 A.D.2d at 240, 259 N.Y.S.2d at 726.

[228]   Composite PI Br. at 33.

[229]   *Id.* (brackets in original).

the trial court believed that the plaintiff's allegations "did not establish such a relationship between the parties, fiduciary or otherwise, as would entitle the plaintiff to an accounting."[230]   In *Kaminsky*, the plaintiff had entrusted stock with the defendant,[231] with an interest in the dividends received on the stock and any proceeds from its sale, after the payment of stated obligations.[232]   The plaintiff had a right of "first option" to get the stock back if the defendant received an offer for it,[233] which the defendant did not honor.   In rejecting the contention that a fiduciary relationship was required in order to justify an accounting, the First Department stated:

> [T[he right of the plaintiff to judgment [for an accounting] *is not to be foreclosed* upon the narrow ground, urged by the defendant, that the agreement between the parties *did not create a fiduciary relationship and that, therefore, the plaintiff is not entitled to an accounting.*   The question instead is, did the plaintiff, on the basis of the allegations of his pleadings, establish a right to any relief at the hands of the court, and, if so, were the directions for an accounting and the other provisions of the judgment proper.[234]

Then, obviously, Composite cannot rely on a general rule that "no [confidential or fiduciary] relationship exists between the sellers and buyers of corporate stock when dealing at arms length."   Here the relationship between Elite and Composite—with Mr. Fletcher, his colleagues, and the Management Company on both sides of the relationship—was most decidedly not at arms' length.   And it is at least arguable, if not obvious, that Mr. Fletcher's failure to complete the redemption when he was still at the

---

[230]   23 A.D.2d at 235, 259 N.Y.S.2d at 721.

[231]   23 A.D.2d at 234, 259 N.Y.S.2d at 720.

[232]   *Id.*

[233]   23 A.D.2d at 235, 259 N.Y.S.2d at 721.

[234]   23 A.D.2d at 236, 259 N.Y.S.2d at 721-22.

helm of Elite was a breach of the fiduciary duties he owed to Elite. Under these circumstances, the Court is unwilling to regard cases dealing with ordinary buyer and seller relationships in the securities market to be controlling.

Additionally, Composite disregards another basis for an accounting under New York law: "The fact that a case involves the consideration and adjudication of issues relating to an account of a complicated character, *even in the absence of any element of mutuality or of trust relationship,* is ordinarily a sufficient reason for a court of equity to assume jurisdiction thereof, upon the ground of its superior equipment to handle and dispose of such issues."[235]

Here the Trustee has sought both equitable and legal remedies in this adversary proceeding, including an equitable remedy—for an accounting, to which the Court believes, if the Trustee's entitlement cannot more easily be determined,[236] the Trustee

---

[235]    1 N.Y. Jur. 2d Accounts and Accounting § 34 (citing *Townsend v. John B. Carter Co.,* 165 A.D. 973, 150 N.Y.S. 757 (1st Dep't 1914); *Chase v. Knickerbocker Phosphate Co.,* 32 A.D. 400, 53 N.Y.S. 220 (2d Dep't 1898)). These authorities are old, but none has been overruled. And this same principle has been articulated in courts in other jurisdictions very recently. Under Florida law, for example, to be entitled to an equitable accounting, "a party must show either (1) *a sufficiently complicated transaction* and an inadequate remedy at law *or* (2) the existence of a fiduciary relationship." *Zaki Kulaibee Establishment v. McFliker,* 771 F.3d 1301, 1310 & n.21 (11th Cir. 2014) ("*Zaki Kulaibee*") (emphasis added); *Blitz Telecom Consulting, LLC v. Peerless Network, Inc.,* 2015 U.S. Dist. LEXIS 170093, 2015 WL 9269413, at *8 (M.D. Fla. Dec. 21, 2015) ("*Blitz Telecom*") (same, quoting *Zaki Kuaibee*). In *Zaki Kulaibee,* the Eleventh Circuit found an accounting to be the appropriate remedy where "without the foundational information that an accounting would have provided, [the plaintiff] was incapable of quantifying its damages, and was thereby precluded from obtaining any meaningful relief." 771 F.3d at 1314.

While an equity court can "exercise its discretion in the matter and deny the accounting where it appears that the complexity is not of such extent or degree as to render legal remedies inadequate, or that the accounting would result in a great inconvenience and possible oppression to the defendant," 1 N.Y. Jur. 2d Accounts and Accounting § 34, it is too soon for this Court to make such a determination in this case. Composite contends that the Trustee has failed so far to establish her damages. The reason for that, in whole or substantial part, is that Composite, which has much better information than the Trustee, has failed to provide an NAV or otherwise provide the information from which the Trustee's redemption entitlement can be ascertained. This is the kind of situation in which authority like *Zaki Kulaibee* authorizes an accounting.

[236]    It sometimes is the case that before a court tries to fix damages by more traditional means, it cannot determine whether an accounting will ultimately be necessary. The *Kaminsky* court,

should be entitled.  For this reason too, *Grupo Mexicano* is not a bar to an asset-freezing injunction here.

## D.  Judicial Estoppel

Finally, the Trustee relies not just on traditional asset-freezing doctrine, discussed above, but also judicial estoppel.  She is right in this respect as well.  Though judicial estoppel did not apply to her request for summary judgment, it applies to her request for the continued asset freeze.

---

recognizing that, held that the possibility that traditional means of fixing damages would be sufficient did not destroy the potential right to an accounting.  The *Kaminsky* court stated:

> At this stage of the action*, it is immaterial that the relief eventually to be accorded to the plaintiff by a final judgment herein may be limited to a monetary recovery*.  …  The court, within the framework of the pleadings in any case, may draw upon its broad reservoir of powers established by law or formulated under the principles of equity, and utilize any of them to afford complete relief to a party. ... *And, in a proper case, an accounting may be directed for the purpose of fixing the amount of such damages.*

23 A.D.2d at 236-37, 259 N.Y.S.2d. at 721-22 (emphasis added).

Some courts have criticized *Kaminsky*, *see Nero v. RCA*, 1982 U.S. Dist. LEXIS 11848 (S.D.N.Y. Mar. 22, 1982) (Conner, J.), or regarded its very direct statement that a fiduciary relationship is not required to be *dictum* or overtaken by time.  *See Chambers v. Weinstein*, 44 Misc. 1224(A), 997 N.Y.S.2d 668 (Table) (Supr. Ct. N.Y. Co. 2014) (Unreported Disposition).  By the same token, *Kaminsky* has been relied on in this District, for the broader principle that plainly emerges from it:  "The remedy of an accounting as provided under New York law is available where special circumstances are present warranting equitable relief in the interest of justice."  *Shimer v. Fugazy (In re Fugazy Express),* 114 B.R. 865, 876 (Bankr. S.D.N.Y. 1990) (Lifland, C.J.), *aff'd* 124 B.R. 426 (S.D.N.Y. 1991) (Duffy, J.), *appeal dismissed,* 982 F.2d 769 (2d Cir. 1992).  Respectfully, this Court has difficulty seeing how *Kaminsky,* especially in all the respects it is relevant here, can be regarded merely as *dictum*.  It conveys a very strong message that when necessary to provide adequate relief, courts have great flexibility as to the appropriate remedy, including by means of an accounting.  At the very least, it is obvious that the Trustee has sought the accounting in good faith.

As the Trustee properly observes, her preliminary injunction motion is one "the Trustee should not have to bring."[237]  It was necessitated by Composite's attempt to renege on assurances given to this Court when not just the Soundview Debtors, but also Composite, "sign[ed] onto"[238] a consensual freeze on the assets in the Wilmington Trust account, to avoid the TRO and preliminary injunction that would have been entered against them in January 2014.

As discussed above,[239] in deciding whether judicial estoppel is warranted, courts in this circuit consider whether the party's later position is clearly inconsistent with its earlier position; the party succeeded in persuading a court to accept the party's earlier position; and the party seeking to assert the inconsistent position would derive an unfair advantage, or impose an unfair detriment on the opposing party.  Here Composite's conduct satisfies all three of those requirements.

Back in January 2014, the JOLs filed an emergency motion seeking a TRO and preliminary injunction seeking essentially the same relief the Trustee seeks now.  The Soundview Debtors, and, importantly here, Composite—which as this Court was told, "are managed by the same entity, Soundview Capital Management," wanted to avoid that.  The Court was told that they "wish[ed] to avoid entry of any TRO under these circumstances out of concerns over continued damage they might suffer among creditors and investors as a result of the entry of a TRO."[240]  And they *agreed that the entry of the freeze was appropriate,* first in the January 2014 Martin Letter and then again in the

---

[237]     Trustee PI Br. at 1 (ECF # 74).

[238]     *See* January 2014 Martin Letter, discussed at page 21 *supra*.

[239]     *See* page 60 *supra*.

[240]     January 2014 Martin Letter at 2.

January 2014 Martin Statements in open court.  Based on that statement, and the voluntary undertaking, the Court found the JOLs' TRO application moot.

Composite has now taken exactly the opposite position.  The earlier position induced the Court not to then enter the TRO, as the Court believed what it was told: that Composite's agreement to the consensual freeze—one that "Composite has agreed it will sign onto"—would be sufficient.  Now Composite has reneged on the promise on which the other parties, and the Court, relied.

Composite's decision to "sign onto" a consensual asset freeze did not happen by accident.  Counsel for the JOLs was nervous about the lack of a TRO and subsequent preliminary injunction, and looked for assurances that a consensual freeze would be sufficient.  At the hearing on the TRO, James Beha, Esq., counsel for the JOLs, began the colloquy that led to the representation upon which the JOLs and the Court later relied:

> MR. BEHA:  Your Honor, the JOLs are simply concerned about this cash being dissipated before this Court makes a decision.  We are happy to take Mr. Martin's representation.  Our only concern is whether—we understand that Mr. Martin is *debtors'* counsel.  Our only concern is *whether he has the ability to bind all of the parties* that may have the ability to dissipate these funds.  And if he is representing that he does, and he is representing that *the Fletcher team at large* will not dissipate these funds before the Court basically sorts out what's happening here, then that is good enough for us. …
>
> But again, if Mr. Martin is able to ensure that these funds do not go anywhere before Your Honor makes a decision, then I think that should be good enough.[241]

Mr. Martin stated, in response:

---

[241]   Tr. of Hrg. of 1/21/2014 (ECF No. 157) at 8 (emphasis added).

-77-

Yes.  I mean, without subjecting myself to a
motion to be disqualified as representing parties that
I shouldn't be representing and I don't represent,
the managers of the Soundview debtors, who are
my clients, are the identical managers of the [*sic.*]
Soundview Composite, which is the entity that
owns these funds. …

I have the representation from those people
who do stand as my clients, with respect to the
Soundview debtors, that Soundview Composite will
do nothing to move those funds absent the
presentation of an acceptable consent order to the
Court.

I take that representation at face value.  I accept it.  I
think the—particularly given the long road that we
have all traveled on in these cases, that it would be
an exercise that would make no sense to do
something other—something else with these funds,
other than protect them and to make sure that to the
extent that Soundview Elite has the primary claim,
that Soundview Elite's claim is satisfied.[242]

Documents in the record confirm that many members of the Fletcher team,

including Mr. Fletcher himself, reviewed and approved the January 2014 Martin Letter

before it was submitted to this Court.[243]  Mr. Fletcher responded to Mr. Martin's draft of

the letter with "Thank you very much. This seems good."[244]  But astoundingly,

Composite claims that even Mr. Fletcher's review and approval of the January 2014

Martin Letter was not enough to bind him to the statements in the January 2014 Martin

Letter.[245]  Given the express representations made to the Court, the Court finds

---

[242]    *Id.* at 9.

[243]    *See* Exh. T to Declaration of Michael J. Dailey in Support of Trustee's Motion for a Preliminary
Injunction, dated 12/1/2014 (ECF No. 75).

[244]    *Id.*

[245]    *See* Composite PI Br. at 10 ("Similarly, though Fletcher had the capacity to act as Soundview
Composite's agent, here, as in *Teamsters*, the Trustee has not cited any evidence that Fletcher was
acting in that capacity when he reviewed and approved the January 21, 2014 Letter.").

Composite's protestations that it was not really bound by them, and that they were made without authority, absurd.

The Court finds the requisite change in position; reliance by the Court; and unfairness all to be present here. It holds that Composite is judicially estopped from now contending that the continued asset freeze is inappropriate.

## Conclusion

For the reasons set forth below, the Court grants summary judgment to the Trustee on all issues other than the amount of Elite's entitlement, and the extent to which other creditors' claims are senior to, or *pari passu* with, Elite's claims. The Court grants partial summary judgment to the Trustee determining that:

(1)    Composite's only outside investor is Elite;

(2)    Elite duly requested a full redemption, by no later than May 2012;

(3)    The trade date for Elite's redemption was September 30, 2011;

(4)    Composite's redemptions have never been suspended;

(5)    Composite's redemptions have never been gated;

(6)    There has been no reason for Composite to gate redemptions, since Composite has only one investor;

(7)    Composite had the right to gate redemptions, but never exercised that right;

(8)    Elite's redemption request was outstanding as of May 2012, and remains outstanding today;

(9)    The value of Elite's redemption request, as estimated by Composite, ranges from $5 million to $3.8 million, and thus is no less than $3.8 million;

-79-

(10)    Composite failed to comply with its obligations to honor Elite's redemption request;

(11)    Composite must honor Elite's redemption request;

(12)    Composite owes Elite the NAV of Elite's shares in Composite as of the close of business of September 30, 2011;

(13)    If less elaborate means to fix Elite's monetary entitlement are impractical, the Trustee is entitled to an accounting for the purpose of fixing Elite's entitlement as a consequence of its redemption demand.

The Court will hold a conference to ascertain whether discovery is necessary incident to the trial on the computation of Elite's entitlement pursuant to its redemption demand, or if there are any other impediments to a prompt trial to fix the amount of Elite's entitlement.  Counsel should be prepared to address the extent to which other creditors' claims need to be ascertained; the amount of any senior creditor claims; the extent to which the Court must rule on the priority of any claims asserted against Composite; and the extent to which any other matters need to be judicially determined before this action can be sent up to the district court for entry of a final judgment.

A trial in the bankruptcy court will thereafter be held as soon as practical to resolve the open issues.

The Trustee is to settle two orders (one with respect to summary judgment,[246] and one with respect to the continued asset freeze) consistent with these rulings.

Dated: New York, New York                     _s/Robert E. Gerber_
           January 4, 2016                          United States Bankruptcy Judge

---

[246]    The Trustee's order granting partial summary judgment may include determinations on matters not included in the above list if they are supported by the Court's rulings as stated in this Decision.

# APPENDIX A

